MATTER OF LAIPENIEKS

In Deportation Proceedings

A-11937435

*Decided by Board September 8, 1983*

(1) The respondent is charged with deportability under section 241(a)(19) of the Immigration and Nationality Act, 8 U.S.C. 1251(a)(19) (the 1978 "Holtzman Amendment"), due to his employment and activities with the Latvian Political Police (LPP) from 1941-43 in Riga, Latvia; he is subject to deportation under that provision if there-is clear, convincing, and unequivocal evidence that (a) "under the direction of, or in association with—the Nazi government of Germany, [or] any government in any area occupied by the military forces of the Nazi government of Germany," the respondent; (b) "assisted or otherwise participated in"; (c) "the persecution of any person"; (d) "because of . . . political opinion."

(2) The Holtzman Amendment was intended to close an "undesirable loophole" in the Immigration and Nationality Act which, unlike special post-war immigration laws such as the Displaced Persons Act of 1948 and the Refugee Relief Act of 1953, previously had not mandated the exclusion or deportation of aliens who were involved in Nazi persecution.

(3) Congress expressly declined to incorporate a specific statutory definition of "persecution" in the Holtzman Amendment, but intended that term to be construed in accordance with the administrative and judicial case law developed in interpreting other persecution provisions contained in the Immigration and Nationality Act.

(4) Section 241(a)(19) of the Act encompasses persecution because of any and all types of political opinion, including communism.

(5) As both an arm of the government of Nazi-occupied Latvia and an organization which was directed by orders issued from a chain of command originating with Reichsfuehrer Heinrich Himmler in Nazi Germany, the role of the LPP was to "combat" Nazi political enemies, particularly communists of all kinds, including those who simply held communist beliefs, were communist sympathizers and supporters, or were engaged in noncriminal activities based upon their communist beliefs; such persons were commonly arrested and incarcerated at Riga Central Prison, often subjected to brutal mistreatment while imprisoned, and sometimes taken to Nazi concentration camps or killed, which constitutes persecution under the Act.

(6) Under the Holtzman Amendment, an alien's motivations and intent behind his assistance or participation in persecution are irrelevant; therefore, we look not to the alien's subjective intent but, rather, to the *objective effect* of his actions in determining whether he assisted or participated in the specified persecution.

(7) The respondent admittedly was employed in the LPP as an armed, paid, full-time, relatively high-ranking officer whose duties included investigation of all types of communists and interrogation of communist prisoners at Riga Central Prison, the information from which was used by his superiors to decide the fate of those suspects and prisoners; thus,

433

the respondent was a necessary link between the LPP/Nazi Security Police and the objects of their persecution, and thereby assisted and participated in the specified persecution.

(8) The record establishes by clear, convincing, and unequivocal evidence that from 1941 to 1943, under the direction of, and in association with, both the LPP and the Nazi German government, the respondent assisted and otherwise participated in the persecution of persons because of political opinion; therefore, he is deportable under section 241(a)(19) of the Act.

(9) An alien deportable under the Holtzman Amendment is statutorily ineligible for suspension of deportation under section 244(a) of the Act, 8 U.S.C. 1254(a), or for the privilege of voluntary departure under section 244(e) of the Act.

CHARGE:

Order:  Act of 1952—Sec. 241(a)(19), [8 U.S.C. 1251(a)(19)]—Assisted or participated in Nazi persecution

Sec. 241(a)(1), [8 U.S.C. 1251(a)(1)]—Excludable at entry under section 212(a)(19) of the Act [8 U.S.C. 1182(a) (19)]—Procured visa by fraud or willful misrepresentation of a material fact

ON BEHALF OF RESPONDENT:
Jan I. Goldsmith, Esquire
Dorazio, Barnhorst, Goldsmith &
   Bonar
Suite B-223
438 Camino Del Rio South
San Diego, California 92108

Ivars Berzins, Esquire
484 West Montauk Highway
Babylon, New York 11702

ON BEHALF OF SERVICE:
Allan A. Ryan, Jr.,
   Director
Neal M. Sher, Deputy
   Director
Clarice R. Feldman
Bruce J. Einhorn
Michael Wolf
Trial Attorneys
Office of Special
   Investigations
United States Department
   of Justice

BY:  Milhollan, Chairman; Maniatis, Dunne, Morris, and Vacca, Board Members

In his decision of June 9, 1982, the immigration judge determined that the Government had failed to establish that the respondent is deportable under sections 241(a)(1) and (19) of the Immigration and Nationality Act, 8 U.S.C. 1251(a)(1) and (19). Therefore, he terminated these deportation proceedings against the respondent. The Government appeals. We reverse with respect to the section 241(a)(19) charge, and, accordingly, the appeal will be sustained on that basis.

The respondent is a 69-year-old native of Latvia and citizen of Chile who was admitted to the United States for permanent residence on March 9, 1960. On June 2, 1981, the respondent was served with an Order to Show Cause alleging that he is deportable under section 241(a)(19) of the Act due to his employment and activities with the Latvian Political Police (LPP) in Riga, Latvia, during the Nazi German occupation there in World War II. It is alleged that the respondent

assisted or otherwise participated in the persecution of persons both because of political opinion and race or religion. The respondent is also charged with having been excludable at entry in that he procured his immigrant visa by misrepresenting material facts concerning his work with the LPP, and other matters as well. The respondent's deportation hearing was conducted in 11 sessions from January 23 to February 18, 1982. The hearing transcript consists of 1,177 pages and the record contains some 150-200 Government exhibits and 14 respondent exhibits. As the proceedings progressed, the factual evidence presented focused principally on allegations regarding the respondent's assistance and participation in persecution because of political opinion. The testimony of 11 of the 12 eyewitnesses presented by the Government related almost entirely to this aspect of the case. The immigration judge ultimately concluded that the Government had failed to prove the respondent's deportability under either of the charges by clear, convincing, and unequivocal evidence, as required by *Woodby* v. *INS*, 385 U.S. 276 (1966). Accordingly, the immigration judge ordered the proceedings terminated.

After our review of the record, we find clear, convincing, and unequivocal evidence that the respondent "assisted, or otherwise participated in the persecution of . . . person[s] because of . . . political opinion" and is therefore deportable under section 241(a)(19) of the Act. Inasmuch as this finding is dispositive of the case before us and as the evidence in this regard is the clearest aspect of the case presented, the appeal will be resolved on this basis alone.

## HISTORICAL BACKGROUND

The alleged events which led to the issuance of the Order to Show Cause took place primarily in 1941 and 1942 during World War II in Riga, Latvia. Latvia is of one of three small Baltic nations located on the eastern shore of the Baltic Sea, situated between Estonia to the north and Lithuania to the south. To the west, across the Baltic Sea, is Sweden, and to the east is the Soviet Union. Latvia has an area of 25,000 square miles. Its capital is Riga, a Baltic merchant city which originated from the Germanic-Hanseatic League in the 16th century. Latvia was a part of the Russian empire from the time of Peter the Great's defeat of the Swedish empire in the early 18th century until the collapse of the Russian empire towards the end of World War I.

After the Russian revolution and Russia's withdrawal from the War, Latvia and its two Baltic state neighbors were temporarily occupied by German forces. Thereafter, Latvia, Lithuania, and Estonia declared their independence in 1918. They remained independent nations until 1940 when they were annexed by the Soviet Union following the German-Soviet treaty of 1939. On June 22, 1941, Nazi German armed forces

invaded the Baltic states, forced out the Soviet troops, and quickly drove to Leningrad where the war front stabilized. Nazi Germany then established occupation governments in Latvia and the other Baltic States. They remained under Nazi German rule from 1941 until the German Army was driven out of the Baltic States by the Soviet Union in 1945. Following the defeat of Germany, the Soviet Union once again annexed the three Baltic nations. The United States has never recognized the legitimacy of the Soviet annexation.[1]

## EVALUATION OF THE GOVERNMENT'S EXPERT WITNESS

Particularized historical background information was provided by testimony of the Government's expert witness, Dr. Raul Hilberg, Ph.D.[2] Dr. Hilberg is a noted author and historian in areas which comprehend the nature of Nazi German military movement and Nazi policies and their implementation in the Eastern occupied territories, including the organization of German police units and their relationship to the local indigenous Latvian police groups. Dr. Hilberg's expertise is based upon his extensive study of captured Nazi documents and other sources on wartime activities, and incorporates his research and analysis of the Nazi German persecution of Jews, communists, and its other political enemies. In support of Dr. Hilberg's testimony, the record also contains copies of several captured Nazi documents. Chief among these is Exhibit G-28, an extensive report dated October 15, 1941, from the commander of *Einsatzgruppe* "A" (to be discussed shortly), General Dr. Stahlecker, to Reichsfuehrer Heinrich Himmler, chief of the Nazi SS and second in command to Adolph Hitler in Nazi Germany. The more specific historical account which follows is a distillation of Dr. Hilberg's testimony, with frequent reference to support found in Ex. G-27 and G-28 and other documents of record.

A principal German policy in the Eastern occupied territories, including Latvia, was the combatting of "political enemies": Jews, communists, and anyone else suspected of being an opponent of the Nazi regime (*see*

---

[1] *See generally* A. Clark, *Barbarossa—The Russian-German Conflict, 1941-1945* (1965); *Times Atlas of World History*, 144 (2d ed. 1979); *Country Reports on Human Rights Practices for 1979*, 689, U.S. Department of State (1980).

[2] Dr. Hilberg is the author of *The Destruction of the European Jews*, Exhibit G-27, a scholarly, highly-regarded compendium of his decades of research into the holocaust. He is a doctor of Public Law and Government, McCullough Professor of Political Science at the University of Vermont, a noted author, and a presidentially-appointed member of the United States Holocaust Memorial Council. He has been accepted as an expert historical witness in the following cases: *United States v. Osidach*, 513 F. Supp. 51 (E.D. Pa. 1981); *United States v. Linnas*, 527 F. Supp. 426 (E.D.N.Y. 1981), *aff'd*, 685 F.2d 427 (2 Cir. 1982), *reh'g denied*, April 5, 1982, *cert. denied*, 103 S.Ct. 179 (1982); *United States v. Kuziy*, 540 F. Supp. 25 (S.D. Fla. 1982); *United States v. Palciauskas*, 559 F. Supp. 1294 (M.D. Fla. 1983).

Tr. pp. 300-01, 304, 346, 350-51, 353, 487, 524; Ex. G-27; Ex. G-28 at 3, 9, 12, 13, 18-21, and App. 1-1). This policy was promulgated by the German S.S. and Reichs Security Main Office (*Reichssicherheitshauptampt*, or RSHA) and communicated to the field by the RSHA. Primary execution of this policy in the first instance was entrusted to four special mobile units of the RSHA called *Einsatzgruppen*, which were to follow closely on the heels of the advancing German armies into any newly-conquered territories (Tr. p. 301). Dr. Hilberg described the operation of the *Einsatzgruppen* as follows:

When the German Wehrmacht—the armed forces—attacked the USSR on June 22, 1941, the invading armies were accompanied by small mechanized killing units of the SS and Police which were tactically subordinated to the field commanders but otherwise free to go about their special business. The mobile killing units were operating in the front-line areas under a special arrangement and in a unique partnership with the German Army.

Ex. G-27 at 177; *see also id.* at 183. When German Army North invaded the northern Soviet occupied territories, *Einsatzgruppe* "A" immediately followed. The subdivision of *Einsatzgruppe* "A" deployed in Latvia was *Einsatzkommando* 2, or E.K.-2. German Army North captured Riga on July 1, 1941, and E.K.-2 entered Riga within a few hours thereafter (Tr. pp. 302-04). When the German Army was unable to advance into Leningrad or beyond, the Eastern Front stabilized and E.K.-2 settled itself in Latvia for the duration of the German occupation (Tr. pp. 336-38).

The organizational structure of these special units was as follows: Reichsfuehrer Himmler had authority over 12 separate bureaucratic departments, including the RSHA (Tr. p. 333). The RSHA was an amalgamation of two units, the *Sicherheitspolizei*, Security Police (or SP), and the *Sicherheitsdienst*, Security Service (or SD). The SP was in turn made up of two branches, the Criminal Police or Kripo (*Landeskriminalpolizeiamt*), and the State Police—Gestapo or Stapo (*Geheime Staatspolizei*) (Tr. p. 319; Ex. G-27 at 181-82). The RSHA commanded and deployed the four *Einsatzgruppen*. *Einsatzgruppe* "A" was headed by Dr. Stahlecker, under the title of SS Commander and Brigadier General of the Police. *Einsatzgruppe* "A" had jurisdiction over the entire Baltic area: Latvia, Estonia, Lithuania, and White Russia (Tr. p. 303). E.K.-2, with jurisdiction over Latvia, was headed by S.S. Major Dr. Lange and his deputy, S.S. Major Kilste (Tr. pp. 303, 345).

The E.K.-2 had three principal functional units, similar to the RSHA: the Security Service, Criminal Police (*Kripo*), and Gestapo. The role of the Security Service was one of counterintelligence and investigation. It would report on the political situation existing in the occupied country and identify various political elements—both those threatening the German authorities and those which could be recruited as collaborators. The role of the Criminal Police involved ordinary and purely criminal

activities such as burglary, rape, and fraud. The Gestapo was the unit in the *Einsatzgruppen* and the *Einsatzkommandos* most responsible for and involved in the combatting of Nazi enemies. Its functions were designated by IV(A)—Communists, and IV(B)—Jews (Tr. pp. 319-20).

It is also important to observe that the Security Police forces of the *Einsatzgruppen* and *Einsatzkommandos* constituted only one of two principal Nazi police organizations functioning in the Eastern occupied territories, the other being the *Ordnungsdienst (polizei)*, the Order Service (or Order Police). While these two police organizations were completely separate in the Baltic and Ukrainian regions, the *Einsatzgruppen*/Security Police[3] and the Order Police were both subordinate to one official, the Higher SS and Police Leader. In the Baltic area this official was General Stahlecker, who reported directly to Himmler (Tr. pp. 340, 519; Ex. G-27 at 243; Ex. G-31). At the more localized level, under the direct authority of the High Leader of the SS and Police was the SS and Police Leader of Latvia named General Schroeder, who was head of both the Order Police and Security Police for that country.(*Id.*) Subordinate to Schroeder were Major Dr. Lange, commander of the Security Police (E.K.-2), and the commander of the Order Police. (*Id.*) This bureaucratic arrangement of the German police forces is important here for an understanding of both their command structure and hierarchy and that of the local indigenous police forces in the occupied territories, which were organized in a form parallel with the German police units (Tr. pp. 325-26, 348-350; Ex. G-28; Ex. G-31).

The necessity for establishing local indigenous police units in the occupied territories is explained by the relatively very small size of the *Einsatzgruppen* and *Einsatzkommandos*. In Latvia, for example, the entire personnel of E.K.-2 was 170 people, with but 47 of them actual police operatives of the Security Service, Gestapo, and Criminal Police (Tr. pp. 322-23, 327-28, Ex. G-28 at App. 2-3). Reichsfuehrer Himmler's directive of July 25, 1941, (Ex. G-34), stated:

> The duties of the [Nazi] police in the occupied eastern territories cannot be fulfilled only with the forces of the police and SS who have been deployed and are yet to be deployed. It is therefore necessary that additional security formations be established expeditiously from the ethnic groups of the conquered territories which are acceptable to us, as has already been done to some extent by the Einsatzgruppen of the Security Police. These security formations are to be set up primarily with Ukrainians, the inhabitants of the Baltic countries, and the White Ruthenians.

*See also* Tr. pp. 339-41. To fill this need in Latvia, the Latvian Auxiliary Police were formed.

---

[3] The terms "Security Police" and "SD" seem generally to have been used synonymously with reference to the various *Einsatzgruppen* and *Einsatzkommandos* and their "security" functions.

As indicated earlier, the Latvian Auxiliary Police were organized similarly to their German counterparts. Thus, they too, were composed of two separate divisions, a Security Police and an Order Police (Tr. pp. 325, 326, 348; Ex. G-31). The Security Police were then similarly divided into a criminal and a political section, called the Latvian Criminal Police and the Latvian Political Police or Department (LPP), the latter being roughly the Latvian counterpart of the Nazi Security Service and Gestapo (Tr. pp. 329, 347, 350, 352, 518, 524; Ex. G-28 at 12-14; Ex. G-31).

The Latvian official in charge of all Latvian Auxiliary Police was Lt. Colonel Veiss (Tr. pp. 347-48, 350, 512, 520, Ex. G-31). Under him were commanders of the Latvian Security Police and Order Police. The chief of the LPP for all of Latvia was named Teidemanis, who was based in the capital, Riga (Tr. pp. 350, 530).

At the local level in the larger cities such as Riga, a Latvian Police prefect was in charge of both Latvian Security Police and Order Police. The Police Prefect of Riga was named Stiglics (Tr. pp. 323, 347, 515, 539; Ex. G-28 at 12; Ex. G-31). The LPP had 217 employees in Riga (Ex. G-28, App. 4-1).

The paramount principle in organization of the Latvian Auxiliary Police was that they were fully under the control of, subordinate to, and received orders from, the Nazi Police authorities (Tr. pp. 306, 342-43, 348; Ex. G-28, Ex. G-31). Salaries of the Latvian Auxiliary Police were paid out of the German police budget (Tr. p. 352; Ex. G-28 at 13). Although the Latvian Auxiliary Police had its own internal chain of command, Latvian police officials also took orders directly from their particular counterparts in the German Police (id.; Tr. pp. 348-49). Thus, Latvian Auxiliary Police Chief Veiss reported to the German Police chief of Latvia, General Schroeder (Tr. p. 348). Teidemanis, chief of the LPP, and the head of the Latvian Criminal Police reported directly to their German counterpart Major Lange, head of E.K.-2 (Tr. p. 342; see also Tr. p. 520). The Prefect of Riga was directed by the German Security Police and Order Police chiefs, to whom the Prefect regularly reported (Tr. pp. 323, 347, 515, 539).

Control by the Germans over the local indigenous Latvian police forces is continually emphasized by Dr. Hilberg and the several German documents of record. For example, the German organizational directive regarding German and Latvian police in Latvia, Exhibit G-31, states: "The principle is: The German police agencies are in command, the Latvian police personnel [are] the implementing force." This was affirmed by Dr. Hilberg (Tr. p. 343). A letter from the General Commissar of Latvia in Riga—the highest German *civilian* official in Latvia—to the Reichs Commissar for Ostland—the highest civilian German official for the entire Baltic region—dated December 10, 1942, stated: "All police forces in the General District of Latvia are directly subordinate to the

German police authorities. The chain of command in the police sector runs from the Reichsfuehrer of the SS through the German police authorities directly down to the last [Latvian] police official . . ." (Ex. G-37; see also Tr. pp. 343, 355-56). And, Einsatzgruppe "A" commander, General Stahlecker, reported to Himmler that the Latvian Security police, including the LPP, "works under the constant supervision of the Einsatzkommando 2, from whom it receives its work guidelines and to whom it must continually furnish detailed reports on its activity . . . . [I]t is guaranteed that all important procedures, especially the political-police [LPP] procedures, will be processed by German police personnel" (Ex. G-27 at 12, 14). (Emphasis supplied.) Thus, the control of the Germans over the various Latvian police units, particularly the LPP, seems clear.

The general purpose of the Latvian Auxiliary Police was to accomplish the aims of the Nazis (see, e.g., Tr. p. 348). Of those aims, the "[t]op priority in the work of the [German] Security Police . . . was the fight against Communism and Judaism" (Ex. G-28 at 18). General Stahlecker reported that after the arrival of German troops in Latvia, local indigenous police units were formed with "[t]he object . . . above all to eliminate those elements who tried to hide their Communist beliefs . . ." (Ex. G-28 at 12). Thus, Dr. Hilberg testified that the mission of the various indigenous Latvian Auxiliary police units was exactly the same as their particular counterpart in the German Order Police and E.K.-2. "There was no independent mission on the part of any indigenous police force" (Tr. p. 329).

As discussed earlier, the role of the LPP was generally analogous to the Gestapo and Security Service units of the German E.K.-2/Security Police, i.e., to "arrest Jews and Communists as well as other political opponents or suspects as the case would arise . . ." (Tr. pp. 350-51). However, the LPP did not have the duty of killing any of the individuals concerned (Tr. pp. 502-03; 520).[4] General Stahlecker reported to Himmler that while the LPP was "directly subordinate to the German Security Police [E.K.-2,] [i]ts activity is limited to investigation, arrest, and interrogation, as well as the procurement of evidence. After completing this work, the files are submitted to the Einsatzkommando together with a recommended decision" (Ex. G-28 at 14). This was confirmed by Dr. Hilberg (Tr. p. 488). Hilberg was adamant that the LPP was, on behalf of the Germans, involved with both Jews and communists. However, the LPP was mostly involved with Jews only in the summer of 1941; from the autumn of 1941 when the remaining Jews were isolated

---

[4] A large part of the "executive" action was taken by a section of the Latvian Order Police called the Schutzmannschaft, and by a Latvian detachment within the E.K.-2 itself called the "Arajs Kommando" (Tr. pp. 502-507, 509-11).

in the Riga ghettos, the LPP no longer dealt with Jews except in iso-
lated instances (Tr. pp. 525-26).[5] This indicates, therefore, that at least
from the latter part of 1941 and on, the LPP dealt primarily with the
remaining principal Nazi "enemy" in the eastern occupied territory,
communists.

It is also important here to make reference to the Riga Central Prison
(RCP), the largest political prison in Latvia. Exhibit G-28, App. 5-3,
reflects that on October 15, 1941, RCP held over 2,800 political prison-
ers (over 40% of all political prisoners in Latvia), and held but a handful
of criminal prisoners. The political prisoners in RCP generally were
placed there by the E.K.-2 or the LPP. Dr. Hilberg testified that the
"likelihood would have been very great" that some of these political
prisoners were eventually killed. RCP was under the direct authority of
Major Lange and the E.K.-2. The chain of command from the E.K.-2
ran through the Prefect of Riga for administrative control and through
Teidemanis and the LPP for functional control, i.e., determining what
was actually done with the prisoners at Riga Central Prison, including
their final "disposition" (Tr. pp. 330-31, 353-54, 538-540).

The close relationship between the German and Latvian police units
in Riga and all of Latvia continued throughout the entire German occu-
pation until the summer of 1944 when Soviet troops began a counterof-
fensive and pushed back the German army. At one point, German troops
in Riga were encircled and cut off, but the Germans eventually effected
a breakout and escaped, with the Soviets subsequently retaking Riga.

## TESTIMONY OF THE GOVERNMENT'S EYEWITNESSES

In addition to the Government's expert witness Dr. Hilberg, and two
other expert witnesses not here relevant, the Government introduced
the testimony of 12 eyewitnesses present in Riga during the time of the
events in question. What follows is a selective and particularized sum-
mary of the testimony of all but one of these eyewitnesses. Two of these
witnesses testified personally at the hearing. The other nine were
deposed on videotape in the Soviet Union under questioning by counsel
for the Government and the respondent, and by the presiding Soviet
official. These videotaped depositions were also transcribed for the
record. Much of the testimony which these witnesses provided with
regard to identifying the respondent and his actions and conduct as a

---

[5] By October 15, 1941, nearly 6,500 Jews and several hundred communists were killed in
Riga, nearly all of them during July and August (Tr. pp. 305, 527; Ex. 28, App. 1-1). In
September, Jewish ghettos were being established, and by October 15, virtually all of the
remaining 28,000 Jews in Riga were assigned to the ghettos. As of December 8, 1941, only
4,500 Jews remained alive in Riga, the balance having been killed by, or under order of,
the occupying Nazi Germans (Tr. pp. 324; 525-26).

member of the LPP at RCP is the subject of controversy and great dispute by the respondent. However, in the summaries which follow, we do not find it necessary to rely on this disputed testimony. Rather, the testimony of these witnesses—all but two of whom were prisoners at RCP—generally will be used only insofar as it illustrates the type of persons who were incarcerated at RCP and what happened to them, or is otherwise not inconsistent with the respondent's testimony.

We note preliminarily, and without specific reference in the individual testimony which follows, that most of the witnesses stated they were arrested, detained, and interrogated by, and routinely came in contact with, only Latvian—not German—officers, guards, etc., during the course of their incarceration at RCP. The general procedure followed in their arrests was for the prisoners to be held initially in cells located beneath the Riga Prefecture for a period of a few days before being transferred to RCP for more long-term incarceration and questioning.

One former RCP inmate who testified at the hearing was Edwards Virsis. Virsis was imprisoned at RCP from July 1941 to August 1942. He testified he had done nothing to cause himself to be arrested and imprisoned. One possible explanation for his arrest was that he was far away from his home when the Germans invaded the Baltic region and he was suspected of being one of the many communists who fled with the Soviet troops during their retreat (Tr. pp. 567-73, 580). With respect to Virsis' testimony, the immigration judge found that he "was apparently charged with having been a pro-Soviet who fled with the Russians when the German troops arrived in Latvia during 1941" (Opinion at 70).

The record also contains a German document issued to Virsis upon his release from RCP, Exhibit G-41A. This "Certificate" was issued by the "German Security Police," "Einsatzkommando Riga," "E.K.-2," and states in printed standardized language that the person named therein, Virsis, "was, because of his political activity, arrested and is, after being checked out through the German Security Police, hereby released. A new arrest is possible according to the case files and on the orders of the German Security Police" (Tr. p. 583). This document clearly illustrates the fact that while it was the Latvian Police who generally performed the actual arrest, interrogation, and other duties incident to the incarceration of political prisoners at RCP, the ultimate authority over the fate and disposition of these prisoners lay with the Nazi E.K.-2.

Arnold Berzins, who testified at the hearing, and Janis Engelis, who testified by videotape (Ex. G-45), were held in RCP because they were suspected of having prepared lists of persons to be deported from Latvia during the Soviet occupation in 1940 and 1941.

Edgars Rode testified by videotape that he was incarcerated first at the Riga Prefecture and then at RCP from July 1941 until the end of 1942. Rode had been a sportsman in Latvia since 1924. During the

Soviet occupation in 1940 and 1941, he was assigned to work on the sports and physical culture committee as an athletics inspector (Ex. G-44 at 9, 12, 48-49). Rode testified that his fellow prisoners had been arrested and jailed because they were Soviet sympathizers (*id.* at 15).

Carlis Smekerstans was incarcerated at RCP from July to November 1941 (Ex. G-46 at 8-9, 16-18). He stated that he had participated in public life during the Soviet occupation and had belonged to the Worker's Guard, and he believed his arrest was a result of those activities (*see* respondent's App. Br. at 108). Smekerstans was released to work at a sawmill near a concentration camp upon agreeing that he would have nothing to do with Jews and communists, nor with any political activities (Ex. G-46 at 20-22).

Nikolays Endelis was arrested July 6, 1941, and detained at the Riga Prefecture for four or five days before going to RCP, where he remained until sometime in 1942 or 1943. Thereafter, he was taken to Salaspils concentration camp for approximately one and a half years (Ex. G-47 at 7, 15, 28). He previously had worked in a bicycle factory where he and 16 co-workers were arrested by Latvian police after the German occupation. Endelis admitted to his interrogators at RCP that he "had been an activist and . . . a so-called Stakhanovist, the one who rationalizes production or processes, simpler or easier means of producing goods" (*id.* at 20-21). He also described the treatment of some fellow prisoners at RCP, including some Komsomol members[6] who were interrogated and beaten, disappeared, and presumed dead (*id.* at 27).

Karlis Zvirgzds was imprisoned at RCP and later at Salaspils concentration camp for a total of about three years (Ex. G-48 at 9). Zvirgzds stated that prior to the German occupation and his arrest, he had been a peasant on his father's farm and was also head of the local Agricultural Society (*id.* at 13). During Zvirgzds' interrogations after arrest, he was asked whether he was a communist or a Komsomol member (*id.* at 36). He testified that he and some other prisoners from RCP were among the first political prisoners to be held at the concentration camp upon their arrival in May 1942, since all the other prisoners there were Jews (*id.* at 17). The immigration judge's characterization of Zvirgzds' testimony—undisputed by the respondent—was that he "was thought to be a communist party member and sympathetic to the Russians" (Opinion at 70).

Juris Beikmanis was a Latvian farmer who was also a communist

---

[6] This term was used in the testimony of several eyewitnesses as well as that of the respondent and Dr. Hilberg, seemingly with some connection to communism but never with a specific definition or explanation. However, Endelis did describe its meaning, saying that "Komsomol members were those involved in the upbringing, the education of young people in order to [*sic*] them to become real Soviet citizens" (*id.* at 27). Thus, this "Komsomol" apparently was charged with the indoctrination, socialization, and training of youngsters to become model citizens of the Soviet communist system.

activist and reserve militiaman prior to the German occupation. However, he never fought against the Germans (Ex. G-51 at 9-10, 15). Beikmanis was incarcerated at RCP from late June 1941 to August 29, 1941, for, he believes, his membership in the reserve militia (*id.*). Beikmanis stated that he and his fellow prisoners at RCP were jailed because they were communist activists, giving as one example the case of prisoner Schmit who was a Party organizer for his county (*id.* at 20, 23). Exhibit G-51 also contains another document issued by the E.K.-2 at Riga releasing this political prisoner from custody, which is identical to the "Certificate" issued to Edwards Virsis.

Janis Otto Ignats was a Latvian Communist Party member in a workers battalion which fought with the Soviet Army in defense of Liepaja, Latvia at the time of the German invasion. When the Germans routed the defenders, Ignats fled with them in defeat, and eventually was arrested by Latvian police near Riga (Ex. G-50 at 13-15, 30). He was imprisoned at RCP from July 1941 to May 1942, when he was taken to Salaspils concentration camp. He later was taken to Talin prison, Stuthaven concentration camp, Bissingen, and finally to Dachau concentration camp, where he was liberated by American troops on April 29, 1945 (*id.* at 33-35). Ignats testified that his fellow prisoners at RCP were political offenders, accused of "being members of the YCL [presumably the Young Communist League], of Komsomol, the Red Guards, militia," or the "Security Department" (*id.* at 20-21). He also described how the RCP prisoners were divided into groups according to the type of their political activity, *e.g.*, Komsomol members, Party members, activists, trade union members, and former guards (*id.* at 24, 35-36). Ignats defined communist "activists" as those who were "active sportsmen, those who took part [in] editing wall papers, and in general cultural work" (*id.*). Ignats stated that eventually the political prisoners at RCP were either released, shot, or taken to a concentration camp (*id.* at 20).

Without making specific reference in the testimonies of these witnesses who were prisoners in RCP, we note that all of them testified that prisoners at RCP were frequently beaten during interrogations. Several described how they themselves were severely beaten with fists, blackjacks, or truncheons. Several saw and/or heard other prisoners similarly beaten or saw the results of such beatings after the interrogations were completed and the prisoners were returned to their cells. Some also told of how they were forced to swallow ink or pills they thought were poison. We also have seen that several of the witnesses were taken to Nazi concentration camps, or knew of others who were taken to concentration camps or were sometimes simply killed.[7] Thus, it

---

[7] The respondent's testimony does not contradict this testimony. He admits that he did strike prisoners with his hands (*see* p. 451, *infra*), but he denies that he ever beat prisoners

is clear that prisoners at RCP were not only deprived of their liberty but commonly subjected to various forms of brutal mistreatment as well.

Vladimir Striguns was one of two witnesses who were not imprisoned at RCP. Striguns had been working for the Communist Party in a partisan group of the Soviet army before the German occupation (Ex. G-49 at 16-17, 50-51). At that time, he was apparently captured and placed in a German prisoner-of-war camp. Upon his release from that camp in December 1941, Striguns returned home and reported to an office at the Riga Prefecture to obtain documents. There, he was arrested after being identified by the wife of the SD chief (id. at 12-13). Striguns was subsequently interrogated by one Persis Sauls. Sauls told Striguns that he would be killed for his activities during the Soviet occupation unless he agreed to collaborate with the SD and work as an informer, identifying persons he knew to be communists. Striguns agreed to collaborate (id. at 16-18). In this role he dealt only with LPP chief Teidemanis, Sauls, or Albert Purins (id. at 28).

Sometime in mid-1942, Striguns met and became friends with Miervaldis Laipenieks, the respondent's younger brother, who was also a member of the LPP (id. at 7-8, 16, 18, 20, 28, 41-42). Striguns saw Miervaldis several times a week, often meeting him at Miervaldis' offices at LPP headquarters or at the restaurant where Striguns worked (id. at 18, 21, 23). Striguns usually would see the respondent when he met with Miervaldis at LPP headquarters (id. at 23). The last time he remembers seeing the respondent was in 1943 before the respondent left the LPP to start a bakery shop (id. at 39).

Because of his collaboration with the LPP and friendship with Miervaldis, Striguns was able to describe in some detail many facts concerning the LPP. He stated that the LPP offices were first located in the Prefecture at Aspaziya Boulevard, which had cells in the basement where he was held upon his arrest in late 1941 (id. at 8-9, 13). In approximately the spring of 1942, the LPP moved to a building at Number 6, Rainis Boulevard. It housed both the German SD and the LPP, each having a separate entrance on Rainis Street and Rainis Boulevard, respectively (id. at 8-9, 13, 15). Some of the Germans wore uniforms, some wore civilian clothes. The LPP did not wear uniforms (id. at 14-15).

In addition to the Laipenieks brothers, Teidemanis, Sauls, and Purins, Striguns also recalled men named Kanders and Sterns as being members of the LPP (id. at 27). He stated that the LPP had certain internal divisions, among them an investigations group, an "Agentura," and

---

with clubs, administered phony poison pills, sent anyone to concentration camps, or was involved in any killings. Nevertheless, he has not denied that such treatment was inflicted upon RCP prisoners by others. *See also* testimony of Salminsh, *infra*, at p. 446.

groups involved with surveillance and with provocateurs (*id.* at 46-47). Striguns testified that *the role of the LPP under Teidemanis was to liquidate "the Communist Party and all other groups that were against the German Order"* (*id.* at 31). (Emphasis supplied.) He also stated that there was an "Arajsgang" which was a separate department in the German SD engaged in shooting and guarding (*id.* at 32).

The respondent's counsel asked Striguns if Miervaldis Laipenieks knew that he (Striguns) had been arrested in December 1941, to which Striguns replied, "I think that there was not a single thing that the Gestapo did not know about me." When asked whether the respondent also knew about him, Striguns replied, "That is the same Gestapo" (*id.* at 52).

Edgars Salminsh, who testified by videotape, was not a prisoner at RCP but a fellow investigator with the respondent in the LPP (Ex. G-52 at 9, 14, 20). In describing the organization and operation of the LPP itself, he testified that it was divided into three sections: Operations, Investigations, and Agentura (*id.* at 8, 21). Each section had its own staff of investigators (*id.* at 24). The Agentura collected preliminary information on suspects and shadowed people. Its reports were passed along to the Operations section for it to effect the arrests of suspects (*id.* at 56-57). The Investigations section did not investigate suspects unless there existed a preliminary report from the Agentura and a charge against them (*id.* at 60).

Salminsh identified the chief of the entire LPP as a man named Teidemanis (id. at 27, 56). Zauls (Sauls) was head of the Agentura section and Teidemanis' deputy (id. at 56). Purins was Zauls' deputy (*id.* at 27). Sterns was head of the Operations section (*id.* at 26-27, 36). Inzers was head of the Investigations section for about the last two years of the German occupation (*id.* at 26). The chiefs of the three sections of the LPP reported to Teidemanis (*id.* at 38). Lange was head of the German SD/E.K.-2. Salminsh emphasized that the LPP was at all times subordinate to the SD (*id.* at 22-23).

Salminsh began working for the LPP in mid-1941 in the Operations section and, a short while later, worked in the Investigations section (*id.* at 9, 19-20, 22, 26). Salminsh's duties as an investigator included searching for information and interrogating prisoners (*id.* at 9, 20). He occasionally interrogated prisoners at RCP. He acknowledged that physical influence often was used in interrogating prisoners, although he tried not to use it himself. However, many of his colleagues heavily used physical influence (*id.* at 32).

Salminsh explained that LPP investigators would obtain the testimony of witnesses, compile written documents, etc., and give their reports to the section chief. The section chief then made his written assessment of the case which he gave to Teidemanis and Lange. These two made the final determination as to whether the person would be

sent to RCP, a concentration camp, or sometimes killed (*id.* at 35-36). Executions were carried out by the Arajs Command (*id.* at 37). Prisoners at RCP were released from custody only upon orders of SD chief Lange.[8]

Salminsh stated that he first worked for the LPP out of the Riga Prefecture (*id.* at 14). Prisoners were held in the basement cells of the Prefecture. If there were indications of their guilt, they were sent to RCP (*id.*). The LPP later moved out of the Prefecture in early 1942 to a building at Rainjs Boulevard next to the SD headquarters.[9]

Salminsh emphasized that the LPP dealt exclusively with Soviet sympathizers and supporters, not Jews (*id.* at 58). He stated that among the prisoners held at RCP were those who had worked in the underground or had hidden or sheltered Jews or prisoners-of-war, Red Guards, Soviet collaborators, and communist activists (*id.* at 16, 33, 41). In "separate cases," Jews were also held at RCP. However, Salminsh never interrogated any Jews because they were strictly isolated (*id.* at 33). He also explained that if, during the interrogation of a prisoner, the LPP learned that he had helped or been involved with Jews, he was to be turned over to a special department under Lange in the E.K.-2—either Department 4A or 4B (he could not remember which), which dealt particularly with Jews.[10] This department was comprised only of Germans (*id.* at 39).

Salminsh testified that the respondent also was an investigator in the LPP (*id.* at 9-10, 25, 28). He identified the respondent as a former sportsman and runner in Latvia (*id.* at 28). At first, Salminsh said that the respondent was in the Investigations section and also the Operations section (*id.* at 9-10). He finally seemed to settle on the respondent being only in the Operations section (which was headed by Sterns) (*id.* at 52).[11] Salminsh recalled that the respondent had a younger, shorter brother who also was in the LPP. This younger brother was not as well-educated as the respondent and so did not work as an investigator; he collected information and shadowed people (*id.* at 10). Salminsh stated that the respondent was one of from five to eight investigators who were sent to interrogate prisoners at RCP (*id.* at 25, 28, 58). He also noted that the interrogators were instructed not to identify themselves to the prisoners whom they interrogated (*id.* at 58-59). Salminsh further stated that in the last period of the German occupation the respondent was not in the LPP but had gone into trade (*id.* at 53).

In other testimony, Salminsh stated that the name Vladimir Striguns

---

[8] *See* pp. 442 and 444, *supra*; Release "Certificates" of RCP prisoners Virsis and Beikmanis, Ex. G-41A and 51.

[9] This is in full accord with Strigun's testimony at p. 445, *supra*.

[10] Dr. Hilberg testified that section IV(B) of the RSHA, *Einsatzgruppen*, and *Einsatzkommandos* was assigned to deal with Jews (Tr. pp. 319-20; p. 438, *supra*).

[11] *See* p. 450, n. 13, *infra*.

was familiar to him but he could not remember in what context (*id.* at 54). He noted that during the German occupation, the organization of trade unions or any other organizations was forbidden (*id.* at 41). Salminsh stated finally that he had been tried and punished for his role in the LPP (*id.* at 61).

## THE RESPONDENT'S TESTIMONY

The respondent himself testified on four days over the course of the hearing. The following summary is not fully comprehensive but excludes testimony concerning the section 241(a)(1) misrepresentation charge and other matters not directly relevant to our resolution of the charge under section 241(a)(19) of the Act.

From 1928 until 1934, at the ages of 15-21, the respondent attended a Latvian teachers' college (Tr. p. 212). There, the respondent stated he was introduced to new political concepts and soon became a member of a nationalistic youth organization which actively opposed socialist-communist ideas (Tr. p. 213). The respondent graduated from the teachers' college in 1934 (Tr. pp. 57-58, 61). In the fall of that year, the respondent volunteered for the Latvian Army and was assigned to the 6th Riga Regiment (Tr. p. 214). He specialized in the ski troops and was later assigned to the officers' school (Tr. p. 214). The respondent subsequently held the rank of warrant officer, a rank just below lieutenant, until he left the service in the fall of 1935 (Tr. pp. 80, 214).

The respondent attended the Latvian State University in Riga from 1936 until 1939 (Tr. pp. 66, 81). During that time, he worked as a teacher in the mornings, and attended class, studied, and engaged in sports activities in the afternoons (Tr. pp. 91, 215). The respondent graduated from the University in 1939 and received a bachelor's degree in economics (Tr. p. 91). On September 3, 1939, he married Tamara Matisons (Tr. pp. 86, 216). He then went to work teaching math, chemistry, the Latvian language, and physical education in a public elementary school (Tr. pp. 91, 92). He also was in the reserve at that time and was called into service just before the Soviet invasion (Tr. p. 92).

During the 1930's and 1940's, the respondent traveled all over Europe to track and ski meets (Tr. p. 83). He traveled to Germany once in 1933 and again in 1936 to the Olympic Games (Tr. pp. 84-85, 86). In the summers of 1936 and 1938, the Latvian government sent him to Finland where he was able to further develop his athletic abilities (Tr. p. 215). He participated in the Army Sports Club and, before the war, many newspaper articles were written about his sports activities (Tr. pp. 248-49).

After the Soviet annexation of Latvia in June 1940, the respondent continued to work both as a teacher and as a property manager, but it

was a very hard time and many of his friends were arrested and murdered by the Soviets (Tr. pp. 93, 217, 1048). He testified that during the Soviet occupation, many of his students disappeared and some were even arrested in his classroom (Tr. p. 217). In June 1941, his wife's parents were forceably carried off to Siberia where they died (Tr. p. 217). At that time, the respondent became convinced that he and his family were also doomed for annihilation, and he fled with his wife and one-year-old son into the forest (Tr. pp. 93, 94, 97, 217-18, 863). They hid there for approximately two weeks until the German troops "liberated" them (Tr. pp. 217-18, 864). The respondent stated that the Soviets deported 60,000 to 75,000 Latvians to Siberia during this time, and also killed thousands more (Tr. pp. 93, 1048).

Upon his return to Riga, the respondent volunteered to assist the Latvian Auxiliary Help organizations in identifying those Latvians who had been killed by the Soviets and buried in mass graves (Tr. p. 218). Two to three days a week, the respondent helped with the task of identifying the exhumed bodies over a period of approximately two to three months (Tr. p. 218).

The respondent testified that before the Soviet occupation of Latvia there existed a government Political Department charged with enforcing the legal ban on the Communist Party in independent Latvia. Most members of this Department were killed during the Soviet occupation. The respondent claimed that the few survivors of that organization such as Victor Bucenieks, Sterns, Zauls, Lieberts, and Teidemanis, organized the LPP after the Germans drove out the Soviets (Tr. pp. 985-88).

In explaining how he came to join the LPP, the respondent stated that Victor Bucenieks was a fellow athlete and runner in his sports club whom he had known for a long time. Bucenieks spoke with the respondent in the summer of 1941, and told him that he had worked for the Political Department before he went into hiding during the Soviet occupation. Bucenieks said that the LPP was now being organized and was seeking new members. The respondent decided to join, and, after a background investigation, he was approved to start work for the LPP in late July (Tr. pp. 220-22, 988-89).

In his testimony, the respondent described the organization and operation of the LPP, including the names of certain officials. He stated that the LPP had three units: an Investigations section, Operations section, and "Agentura" (Tr. p. 240). The role of the Agentura, at least in part, was to "shadow" suspects and to send its agents into underground groups (Tr. p. 241). The Operations section would interrogate witnesses and otherwise gather background information on suspects, and arrest people (Tr. pp. 240, 999). The respondent worked in the Investigations section (Tr. p. 993). Dr. Rudolph Lange was head of the German SD/E.K.-2 (Tr. pp. 242, 1041). Teidemanis was head of the LPP (Tr. pp.

449

242, 261, 266). The remainder of the respondent's testimony-in which he identified the chief personnel of the LPP was somewhat confusing and not wholly consistent. The respondent stated that Alfred Sterns was head of the Operations section; Persijs Zauls was head of the Agentura; the Investigations section was headed first by Inzers, and later Sterns (Tr. p. 240). Albert Purins handled in formers (Tr. p. 242).[12] The respondent once stated that Purins was head of the Agentura (Tr. p. 1040). The respondent stated that Sterns was at one time the head of the Investigations section (Tr. p. 240), and later identified Sterns as the head of the Operations section and Persijs Zauls as the first chief of the Investigations section, which was later headed by Inzers (Tr. p. 993). The respondent once identified Sterns as his immediate superior in the LPP (Tr. p. 241). On another occasion he named Sterns and Zauls as his superiors (Tr. p. 991). Inzers was also identified as the respondent's superior (Tr. p. 1001).[13]

The record also contains a certified copy and translation of a document dated July 9, 1942, in Riga, Latvia, (Ex. G-57). The letterhead of that document reflects that it is from the "Commander of the Security Police and Security Service of Latvia, Latvian Political Detachment (LPP)." It is directed to the "Chief of the Latvian Criminal Detachment of Riga" and is signed by "H. Teidemanis, Chief of Latvian Political Detachment of Riga." It is co-signed by "P. Zauls, Chief, Agentura section." The respondent confirmed that the names and titles of these two LPP officials were correct and accurate (Tr. p. 266).

The respondent worked for the LPP as an investigator, investigating "all kinds of communists" (Tr. p. 234). He stated that the role of the LPP was to discover and uncover Latvian communists who remained in Latvia after the Soviet retreat and withdrawal (Tr. p. 227). The respondent explained that most of the communists from the time of the Soviet occupation fled with the retreating Soviet army when the Germans invaded Latvia. Persons who were found retreating with the Soviets were brought to Riga to investigate whether they were communists. Suspected communists were imprisoned at RCP. The respondent characterized RCP as a "*terminal* prison" (Tr. pp. 234-37).

The respondent worked out of the LPP headquarters. This was first located at the Riga Prefecture, but changed offices to Number 6, Rainis

---

[12] *See* p. 445, lines 16-17, *supra.*

[13] *Cf.* the testimony of fellow LPP member Salminsh at p. 447, *supra.* Considering the variance of the respondent's testimony regarding the three or four section chiefs he named as his immediate supervisors—particularly his identification of Sterns both as his immediate superior and head of the Operations section—it is not surprising that Salminsh was of the belief that the respondent worked in the Operations section. The central consistent fact exhibited by Salminsh's testimony is that the respondent did work as an investigator and an interrogator at RCP for the LPP.

Boulevard sometime in 1942 (Tr. pp. 230-31, 233, 264-65, 989, 994, 1000).

Part of the respondent's job as an investigator with the LPP involved obtaining information about "accused people" and their behavior during the Soviet occupation, including those responsible for deporting Latvia is (Tr. pp. 991, 999). The respondent would obtain from his superior a l.st of persons whom he was to interview, often at their places of work, and ask them questions about what certain accused persons did during the Soviet occupation. For example, the respondent would go to a factory and question the directors concerning the communist activities at the factory of the "high-appointed Soviet people" who had run away. He made notes of the information he obtained and turned them over to his superior. After his report was made, the Operations sec.ion of the LPP would make any necessary arrests (Tr. pp. 990-91). The respondent indicated that at times he would engage in surveillance of communist "pigeons" and sometimes was authorized to decide when to arrest those communist suspects (Tr. pp. 259-60).

The respondent's duties also involved the direct interrogation of accused persons and prisoners. He was taught how to review the existing investigative reports on the prisoners, including documents and statements by witnesses, and ask questions about their activities during the Soviet occupation. The respondent would then prepare his report, or "protocols," and present this to his superior after completion of the interrogation. Much of this interrogation work was done at the LPP headquarters at the Riga Prefecture and, later, Rainis Boulevard. The respondent also regularly went to RCP to interrogate prisoners there. The respondent explained that in the beginning, RCP prisoners were brought to the LPP headquarters for interrogation. However, when transportation for the prisoners became unavailable, the respondent would go to RCP to interrogate prisoners at least once or twice a week (Tr. pp. 229-33, 237, 264-65, 1000-01, 1004, 1042-43, 1047-1048).

The respondent described the procedure for interrogating prisoners at RCP as follows. He would arrive at his office at LPP headquarters in the morning and find a list of five or six prisoners for him to interrogate at RCP. This assignment was given to him by Sterns, Zauls, or Inzers. A group of about six investigators was assigned to conduct the various interrogations, which they conducted in pairs. Interrogations took place with one prisoner at a time, who was brought by guards from his cell to the two LPP interrogators in a separate interrogation room. The interrogators never introduced themselves to the prisoners (Tr. pp. 1000-1006). The respondent always had a pistol with him during the interrogations for self-protection; the respondent possessed three pistols, one of which he would carry at all times (Tr. pp. 259, 1006). The respondent admitted that during his interrogation of prisoners, he sometimes beat them with his hand to "help" the prisoners "to talk" (Tr. p. 257). He also

stated that he had no say as to who was kept in or released from RCP. He would only give his protocols to his supervisors, and they made the decision (Tr. p. 1019).

The respondent also described one occasion on which he actually went to a prisoners' cell at RCP. The respondent's superiors explained that RCP was overcrowded with prisoners, including "many, many innocent people who should be investigated and interrogated" so that those innocent ones could be identified expeditiously and released (Tr. p. 1007). The respondent was directed to go to a cell at RCP and divide the prisoners into groups. He first separated those who lived in the Riga area from those who had resided elsewhere. This was done because it was easier to quickly obtain information on the local Riga prisoners (Tr. pp. 1008-09).

The Riga group was then further divided into three groups. The first was comprised of those who said they were falsely accused of being communists. "The first group . . . said they never took any part, somebody accused just them [of] being some sympathizer to the Communist Party's functionaries and organization, some just for having revenge: 'I don't like his face, so he's a communist" (Tr. p. 1009).[14] The second group contained Soviet Red-Guards who had assisted in the killing and deportation of Latvians (id.). The third group was comprised of Communist Party members, as well as some communist officials who were involved in actions against Latvians during the Soviet occupation (Tr. pp. 1009-10).

Apparently as a result of his successes in his first year with the LPP, men from the Latvian Army, mostly captains and lieutenants, were assigned to the respondent in the autumn of 1942 (Tr. pp. 230-31). From this time until leaving the LPP in 1943, the respondent's duties changed somewhat, and he devoted most of his time to the pursuit of Soviet agents, paratroopers, spies, and saboteurs operating inside Latvia (Tr. pp. 228, 233, 1030-31, 1042-43). The respondent continued to do some interrogation work at RCP, but not like before (Tr. pp. 234, 1042-43).

The respondent acknowledged that he did have a brother named Miervaldis who was a member of the LPP. He worked under Sterns in the Operations section. Miervalids' job was to interrogate witnesses and to locate and arrest suspects (Tr. pp. 995-99). The respondent did not recall knowing anyone named Striguns who was a friend of Miervaldis. However, when asked about Striguns' testimony concerning an episode with a Soviet spy named Rode in which the respondent had participated,

---

[14] Although these persons allegedly were wrongly accused, this testimony of the respondent clearly demonstrates that many persons were arrested and jailed at RCP not because of their illegal actions but merely because they were thought to be Soviet/communist sympathizers.

the respondent agreed that there was in fact an incident which took place similar to that described by Striguns (Tr. p. 1027). The respondent also confirmed that there was a man named Edgars Salminsh who worked in the Investigations section of the LPP (Tr. p. 997).

In other testimony, the respondent stated that there was a group of Latvian soldiers called the Arajs Kommando which, he heard, killed people (Tr. p. 203). He said that to his knowledge, the LPP did not interrogate, imprison, or otherwise become involved with Jews (Tr. pp. 202, 265). He dealt solely with communists (Tr. p. 1044). The respondent stated that only communists were detained at RCP; he was not aware of any Jews being held there (Tr. pp. 236-37). He also testified that he and all the LPP wore civilian clothes; only the Germans wore uniforms (Tr. pp. 243, 1007).

At one point in his testimony, the respondent stated that the German SD/E.K.-2 headquarters was located at "Reimers Iela" which was not the same building as the LPP headquarters. He claimed he did not know what the function of the SD was and that he had nothing to do with them (Tr. p. 243). However, the respondent's subsequent testimony about how he came to resign from the LPP points up some inconsistencies with these claims. The respondent says he decided to leave the LPP because the Germans were completely taking over the LPP (contrary to his assertion that he did not know what the SD did and that he had nothing to do with them in the LPP). He explained that his request to leave the LPP prompted an investigation of him, culminating in a personal interview with Major Lange, head of the SD, at his headquarters offices on the third or fourth floor of a building on Rainis Street.[15] Lange was apparently satisfied that the respondent had performed his duties properly and was seeking to leave the LPP in order to take over the bakery of his father-in-law (Tr. pp. 1040-41).

Upon leaving the LPP, the respondent testified that he received a certificate which stated he had performed a great service to the German Armed Forces as a member of the LPP. This certificate later saved the lives of himself and his family when it enabled them to obtain safe passage and escape from Latvia in 1944 through the lines of the retreating German Army during a Soviet offensive (Tr. pp. 245-46, 202, 1048).

After leaving Latvia, the respondent lived for various periods of time in East Prussia, Austria, and France before deciding to leave Europe and immigrate to Chile in 1947 (Tr. pp. 882, 173-74, 872-73, 166-67, 173, 945, 948). In Chile, the respondent lived and worked from 1947 to 1960 as a professor of physical education and as a track coach. In 1960, he

---

[15] This address of the SD headquarters on Rainis Street contradicts the respondent's earlier testimony fixing the address at "Reimers Iela." However, it is consistent with Striguns' testimony placing the SD headquarters on Rainis Street. *See* p. 445, *supra; see also* p. 447 and n. 9, *supra.*

obtained a visa to immigrate to the United States and accepted a teaching position in the physical education department of the University of Denver (Ex. G-1A; respondent's App. Brief at 27).

## STATUTORY LEGAL STANDARD

Section 241(a)(19) of the Act provides for the deportation of aliens who—

during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—
   (A) the Nazi government of Germany,
   (B) any government in any area occupied by the military forces of the Nazi government of Germany,
   (C) any government established with the assistance or cooperation of the Nazi government of Germany, or
   (D) any government which was an ally of the Nazi government of Germany,
ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion.

The events at issue in this case clearly fall within the specified time frame of 1933 to 1945. The particular elements of the statute with which we are concerned here are whether: (1) "under the direction of, or in association with—the Nazi government of Germany, [or] any government in any area occupied by the military forces of the Nazi government of Germany," the respondent; (2) "assisted or otherwise participated in"; (3) "the persecution of any person"; (4) "because of . . . political opinion." If these four elements are established by clear, convincing, and unequivocal evidence, the respondent is subject to deportation.

*(1). Under the Direction of, or in Association with, the Nazi Government of Germany or Any Government in Any Area Occupied by the Military Forces of the Nazi Government of Germany*

There is no dispute that from the relevant times of mid-1941 to mid-1943, Latvia was an area occupied by the military forces of Nazi Germany. Nor does the respondent dispute that at that time he was associated with and under the direction of the LPP. The only remaining question for this first element is, did the LPP operate under the direction of or in association with the Nazi government of Germany, or constitute a part of "any government" in Latvia? We have no doubt that it did.

We find that there is overwhelming evidence of record to demonstrate that the LPP (and its employees) operated under the direction of and in association with the Nazi German government, thereby satisfy-

454

ing the requirements of section 241(a)(19)(A). In support of this conclusion, we need only briefly summarize some of the evidence, which includes the expert testimony of Dr. Hilberg, the many Nazi documents, and the corroborative testimony of Striguns, Salminsh, and even the respondent. For example: all Latvian police groups were organized in parallel with their Nazi counterparts; Latvian police were paid out of the German police budget; the chain of command over the LPP ran from Reichsfuehrer Himmler through Stahlecker, Schroeder, and E.K.-2 chief Lange to Teidemanis, the LPP chief; all Latvian police, *especially* the LPP, were subject to Nazi authority and direction (*see* particularly pp. 439-40 *supra*); the LPP was the implementing tool for accomplishing Nazi objectives; although prisoners at RCP were usually arrested by Latvian police and interrogated by the LPP, it was the E.K.-2 which controlled the prison and authorized the release of prisoners; even the Release Certificates themselves for these prisoners were issued by the E.K.-2 and recited that the prisoners had been "checked out through the German Security Police" and always were subject to rearrest "on the orders of the German Security Police;" the E.K.-2 and LPP apparently had adjacent headquarters; Striguns viewed the LPP and Gestapo as one in the same, and described the role of the LPP as dedicated to the elimination of German enemies; Salminsh stated flatly that the LPP was always subordinate to the SD; the respondent acknowledged that he resigned from the LPP because the Germans were completely taking it over; his resignation warranted the personal attention and involvement of the E.K.-2 chief; the respondent's discharge Commendation Certificate recited the valuable service he had performed for the Germans. Again, this is only some of the evidence of record which fully demonstrates the intimate connection and control of the Nazi German Government and E.K.-2 over the LPP.

Moreover, we find that the LPP constituted a part of the "government" in Nazi-occupied Latvia. By definition, any police unit is inherently a department of the government, a part of its executive function, which performs such duties as preventing and detecting crime, enforcing laws, and maintaining order. Indeed, a formal police group simply does not exist apart from or without sanction and authority from a government. The LPP was certainly operating as an arm of the "government" in Latvia. It matters not whether the LPP was equivalent to a reconstituted "Political Department" from the days of independent Latvia, as the respondent claims, or was merely an extension of the Nazi Security Police. The statute requires only that the LPP have been an arm of "*any* government" in Nazi-occupied Latvia.[16] This it was. Thus, the respondent's membership in the LPP placed him under the direction of, and in

---

[16] The statute appears to establish an irrebuttable presumption that specified persecution carried out in connection with any government in occupied Nazi territory was ulti-

association with, the government in Nazi-occupied Latvia, thereby satisfying the section 241(a)(19)(B) component.

Based upon the foregoing, we find that the first element of deportability under both prongs (A) and (B) of section 241(a)(19) has been established.

### (2) *The Persecution of any Person*

In order to properly construe the meaning and application of the term "persecution" in section 241(a)(19), it is necessary first to refer to its legislative history. The deportation provisions of section 241(a)(19), together with section 212(a)(33) and other related provisions, were added to the Immigration and Nationality Act in 1978 by the so-called "Holtzman Amendment," Pub. L. 95-549, 92 Stat. 2065. The expressed purpose of the Holtzman Amendment was to eliminate "an undesirable loophole in current United States immigration law" under the Immigration and Nationality Act. H. R. Rep. No. 95-1452, 95th Cong., 2d Sess. 3, *reprinted* in [1978] *U.S. Code Cong. & Ad. News* 4700, 4702. This legislative history noted that most persons who immigrated to the United States after World War II because of being uprooted during that conflict were admitted under authority of the Displaced Persons Act ("DPA") ch. 647, 62 Stat. 1009-1014 (1948) or the Refugee Relief Act of 1953. Both contained prohibitions on the entry of aliens who had been involved in Nazi persecution. Such persons who entered the United States in violation of those prohibitions were (and are) subject to deportation. However, Congress was concerned that since the Immigration and Nationality Act contained no similar provision excluding persons who had been involved in Nazi persecution, such persons who entered the United States pursuant to the Act were not subject to deportation. *Id.* Accordingly, the Holtzman Amendment was intended to close this loophole and render such persons excludable and deportable.

In its consideration of the Holtzman Amendment, Congress recognized that the existing Immigration and Nationality Act contained no express definition of the term "persecution," *id.* at 4704, and it thoroughly explored the merits "of including in the bill a definition of the phrase 'persecution because of race, religion, national origin or political opinion.' Such inclusion was deemed unnecessary in light of the substantial body of preceden[t] already discussed and the success achieved in administering current Immigration and Nationality Act provisions, such as sections 203(a)(7) [now section 101(a)(42)(A)] and 243(h), without the benefit of an express definition." *Id.* at 4705. The Congressional report then observed:

---

mately accomplished on behalf of the Nazis, or at least was substantially equivalent thereto and so warrants the same condemnation and consequences under the Act.

Generally this case law has described persecution as the infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive (*e.g.*, race, religion, political opinion, etc.), in a manner condemned by civilized governments. The harm or suffering need not [only] be physical, but may take other forms, such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life.

*Id.* at 4704. It concluded that,

In applying the "persecution" provisions of the bill, it is the intention of the committee that determinations be made on a case-by-case basis in accordance with the case law that has developed under the INA sections heretofore cited, as well as international material on the subject such as the opinions of the Nuremberg tribunals.

*Id.* at 4706.

As indicated by the legislative history, "deprivation of liberty" clearly was considered to be one possible manifestation of "persecution." Persecution encompasses both "physical" and "mental" aspects. *See United States* v. *Osidach, supra* n. 2, at 98-99; *Kovac* v. *INS,* 407 F.2d 102, 106-107 and n. 9 (9 Cir. 1969); H. R. Rep. No. 745, 89th Cong., 1st Sess. 22 (August 6, 1965). "Physical persecution" generally has been interpreted to include at least "confinement, torture, or death inflicted on account of race, religion, or political opinion." *Blazina* v. *Bouchard,* 286 F.2d 507, 511 (3 Cir. 1961). Moreover, the *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 51 (1979), published by the Office of the United Nations High Commissioner for Refugees, states that pursuant to the United Nations 1951 Convention and 1967 Protocol relating to the Status of Refugees, "a threat to life or freedom on account of race, religion, nationality, political opinion or membership of a particular social group is always persecution." And, in the Refugee Act of 1980, Congress amended section 243(h) of the Immigration and Nationality Act to provide for withholding of deportation where an "alien's life or freedom would be threatened." This was not intended to effect any substantive change in law but merely to incorporate the language of the United Nations Convention and Protocol into the statute. *See Matter of McMullen,* 17 I&N Dec. 542, 545 (BIA 1980); *see also Rejaie* v. *INS,* 691 F.2d 139 (3 Cir. 1982).

Bearing in mind the foregoing standards and criteria for assessing what constitutes persecution under the Act, the undisputed facts here are that those persons who were objects of LPP investigation, arrest, and interrogation were routinely deprived of their liberty and incarcerated for various lengths of time. The record also demonstrates that RCP prisoners were commonly subjected to various forms of brutal mistreatment. The several eyewitnesses who were prisoners at RCP testified that they and/or their fellow prisoners were frequently beaten severely with fists and clubs during interrogations, while some witnesses also told of being taken to concentration camps or spoke of other prisoners who were killed or taken to concentration camps. *See* pp. 444-45, *supra.*

457

LPP officer Salminsh testified that physical influence often was used in interrogating prisoners at RCP. He also acknowledged that some prisoners were sent to concentration camps or killed. *See* pp. 446-47, *supra.* The respondent himself admitted to hitting prisoners with his hands during interrogations, and did not deny that the mistreatment previously described was inflicted upon RCP prisoners by others.

This incarceration and infliction of brutal mistreatment or even death described above clearly establishes that those objects of LPP activity imprisoned at RCP were subjected to persecution. Thus, the second element of the statute is satisfied. Accordingly, we turn next to an examination of whether those persons were persecuted because of their political opinion.

### (3) *Persecution Because of Political Opinion*

In addressing the element requiring persecution "because of . . . political opinion" under section 241(a)(19), the respondent first contends that he and the LPP were concerned with only those communists who had taken part in the killings, deportations, and other crimes and betrayals against the Latvian people following the Soviet occupation of Latvia in 1940. He argues that this is not persecution because of political opinion.

We would agree with the respondent's position that the mass murder and forceable deportation of Latvian citizens which apparently took place under the Soviet occupation were clearly criminal in nature, and the efforts by the respondent and the LPP to locate, arrest, and punish those responsible for such crimes constitute prosecution for criminal conduct, not political persecution. The respondent properly points out that the House Judiciary Committee expressly stated in its report on the Holtzman Amendment that it "does not intend that the persecution language of [the Amendment] include general prosecutions for criminal offenses, unless for an offense which is 'purely political' in nature." H. R. Rep. No. 12509, *supra*, at 5.[17] "It is not political persecution, for instance, to punish for violation of a fairly administered passport law." *Coriolan* v. *INS*, 559 F.2d 993, 1000 (5 Cir. 1977); *see also Matter of Nagy*, 11 I&N Dec. 888 (BIA 1966); *Matter of Chumpitazi*, 16 I&N Dec. 629, 633-34 (BIA 1978). Nor, for example, does criminal prosecution for misappropriation of funds constitute "persecution." *Matter of Sun*, 11 I&N Dec. 872 (BIA 1966).

It is clear that those persons involved in the mass killings and deporta-

---

[17] The United Nations *Refugee Handbook, supra*, ¶¶84-85, states that, "If the prosecution pertains to a punishable act committed out of political motives, and if the anticipated punishment is in conformity with the general law of the country concerned, this is not 'persecution.'" However, where one is "exposed to excessive or arbitrary punishment for the alleged offense[,] [s]uch punishment will amount to persecution." *See also id.* at ¶152.

tions of Latvian citizens during the Soviet occupation, as well as the spies, saboteurs, and the like who operated in German-occupied Latvia, engaged in criminal conduct of a type which any government is entitled to proscribe and punish. Therefore, we conclude that the efforts of the respondent and the LPP to identify, apprehend, and punish such persons does not in itself constitute persecution because of political opinion.[18]

While prosecution and punishment alone of those who commit crimes is not political persecution, subjecting individuals to imprisonment and other abuses simply because of their political opinion or conduct based thereon which is *not* of a criminal nature does constitute persecution under the Act. The record establishes that the actions of the respondent and the LPP were directed not only at suspected communist criminals (such as witnesses Berzins and Engelis—*see* p. 442, *supra*) but also at those who were simply communist sympathizers, Party members, and others engaged in *non*-criminal activities. In other words, they sought to apprehend all communists in general.

We have already set forth our finding that the LPP was intimately connected with and under the direction of the German E.K.-2. Inasmuch as the record shows that the E.K.-2 was involved in "combatting" all communists, and that its Latvian counterpart, the LPP, was used to accomplish the goals of the E.K.-2, it is apparent that the LPP also participated in the persecution of communists. For example, a principal *Nazi policy in occupied Latvia was the combatting of "political enemies'—communists, Jews, and other suspected Nazi opponents*. *See* pp. 436-37, *supra*. General Stahlecker emphasized that the "top priority in the work of the [German] Security Police . . . was the fight against Communism and Judaism" (Ex. G-28 at 12). To carry out this priority, the *Einsatzkommandos* and *Einsatzgruppen* contained section "IV(A)" which dealt with Communists, and section "IV(B)" which dealt with Jews." *See* p. 438, *supra*. The general purpose of the Latvian Auxiliary Police was to accomplish the aims of the Nazis, and the particular role of the LPP was to arrest communists, Jews, and other Nazi "political opponents" as an adjunct to the E.K.-2. *See* p. 440, *supra*. The primary goal of these indigenous Latvian police was "to eliminate those elements who tried to hide their Communist beliefs." *Id.* It also appears that after at least the autumn of 1941, the LPP dealt mostly, if not exclusively, with communists. *See* p. 441, *supra*. This and the other evidence of record, while making occasional reference to the pursuit of communists who engaged in criminal acts, ordinarily refers simply to the pursuit of com-

---

[18] While punishment of criminal conduct in itself is not persecution, where that punishment entails such things as severe beatings or being sent to a Nazi concentration camp—*i.e.*, is "excessive or arbitrary"—and is motivated by one of the specified grounds, such punishment would constitute persecution under the Act. *See* n. 17, *supra*.

munists generally, making no distinction as to the particular "type" of communist. Typical is General Stahlecker's comment just cited that they sought to eliminate all those who tried to hide their Communist *beliefs*.

In addition to the foregoing, the individual testimonies of the various eyewitnesses and the respondent himself also show that the LPP persecuted all types of communists. Striguns became an informer for the LPP, identifying persons who were communists. He stated that the role of the LPP was to liquidate the Communist Party and all other groups that were against the German Order. *See* p. 446, *supra*. Former LPP officer Salminsh emphasized that the LPP dealt only with Soviet/communist sympathizers and supporters (not Jews). *See* p. 447, *supra*.

In his own testimony, the respondent preferred to focus on his activities with communist spies, saboteurs, paratroopers, and those who were criminals during the time of the Soviet occupation. However, the respondent also testified that he worked for the LPP investigating "*all kinds of communists*," and stated that the role of the LPP was to pursue communists who remained in Latvia after the Soviet retreat and German occupation. *See* p. 450, *supra*. He also noted that suspected communists and Communist Party members were imprisoned at RCP. *See* p. 452, *supra*. And, he implicitly acknowledged that even people who merely held political opinions in support of communism were imprisoned at RCP as well. *Id.* and n. 14, *supra*.

The testimony of the several former prisoners at RCP also shows that political criminals were not the only type of communists imprisoned at RCP by the LPP. Edwards Virsis was imprisoned for over one year at RCP because he was suspected of being "pro-Soviet." Edgars Rode was an athletics inspector on a government sports committee during the Soviet occupation of Latvia. There is no suggestion whatsoever that, as an athletics inspector, Rode was in any way involved in inflicting harm or violence on Latvians. Yet, he was imprisoned for approximately one and one-half years. Rode also testified that his fellow prisoners at RCP were held because they were Soviet sympathizers. Prisoner Carlis Smekerstans was released from RCP to work near a concentration camp upon the condition that he have nothing to do with communists, Jews, or any political activities. Nikolays Endelis was imprisoned at RCP and Salaspils concentration camp for approximately three years because he had been an "activist" and a "Stakhanovist"—working at his bicycle factory to simplify and improve their production methods. Again, there is no indication that these activities were in any way criminal. He also testified that among the prisoners at RCP were Komsomol members.[19]

---

[19] Komsomol members are described in this record as persons who provided Latvian youngsters with training, indoctrination, and socialization to become model Soviet-communist citizens—which activities clearly do not rise to the level of criminal conduct.

Karlis Zvirgzds also was imprisoned at RCP and Salaspils concentration camp for three years. He had been a rural farmer and head of the local agricultural committee. He was arrested as a suspected Communist Party member and Soviet sympathizer, and was interrogated by the LPP as to whether he was a communist or Komsomol member. Juris Beikmanis was a Latvian farmer and communist activist who was a prisoner at RCP for several months. He testified that his fellow prisoners were held because they were communist activist, giving as one example a prisoner who had been a local Party organizer. RCP prisoner Janis Otto Ignats testified that his fellow prisoners were political offenders, including Communist Party members, Komsomol members, Young Communist League members, communist activists, and trade union members, as well as former Red Guards and militiamen. He defined "activists" as those involved with sports or cultural work.

Based upon the foregoing, we are satisfied that the LPP assisted and participated in the persecution of persons not only because of criminal conduct but also because of their communist political opinions, sympathies, or activities stemming therefrom which were not of a criminal nature. Party organizers, trade unionists, members of communist agricultural or sports groups and committees, educators of youth in communist beliefs, Communist Party members, or Soviet/communist sympathizers are not intrinsically criminals. Yet, it was these very people who were among those jailed and brutally mistreated at RCP and with whom the respondent and the LPP were involved. Therefore, we find that the third element of section 241(a)(19), persecution "because of political opinion," is established.

The respondent has attempted to avoid an affirmative finding on this issue by contending that communism is not an included form of "political opinion" under the Holtzman Amendment. The respondent acknowledges that communism is a political opinion and that under a literal reading of section 241(a)(19), persecution of communists comes within the scope of the statute (App. Br. at 237). However, he asserts that the statute must be interpreted in a manner consistent with the overall intent of the immigration laws; therefore, he urges that it would be "contradictory for Congress, on the one hand, to enact immigration statutes that are, in every respect, discriminatory against communists and then, on the other hand, to deport individuals based on their efforts to resist communism" (id. pp. 238-39). We find this argument to be without merit.

It is true that under present and past immigration law, communist aliens generally have been subject to exclusion and deportation from the United States. Nevertheless, the failure of Congress to extend its *hospitality* to communists in the United States in no way demonstrates that it condones and approves of those who engage in the *persecution* of

communists. We see nothing "contradictory" in the conclusion that persons who have been involved in Nazi persecution—regardless of how unfavorably the particular persecution victims might be viewed—are undesirable and unworthy to enjoy the hospitality of the United States. For example, although the DPA precluded communists from eligibility as "displaced persons," at the same time it also denied such eligibility to anyone who had persecuted "civilians" generally, without restriction. There was no expressed intent to exclude communists from the all-encompassing term "civilians." Similarly, section 241(a)(19) is clear and unambiguous on its face. It refers to the persecution of "any person" because of his "political opinion." Again, there is no expression of intent to exclude communists from the all-encompassing terms "any person" and "political opinion." In other sections of the Immigration and Nationality Act and previous statutes, Congress has demonstrated its ability to draft provisions with specific reference to communists where it deemed necessary. Therefore, its failure to specifically reference and exclude communists from the class of persons persecuted under section 241 (a)(19) and related provisions of the Holtzman Amendment demonstrates that Congress intended no distinction between communism and any other type of political beliefs for purposes of the Amendment.[20] There is nothing to suggest that anything other than a literal reading of its provisions is appropriate. Accordingly, we conclude that under section 241(a)(19), communism is an included form of "political opinion" and that those who are involved with the specified persecution of communists are deportable under the statute.

We would add that our role is to interpret and apply the statute as it is written, not to fashion distinctions and exclusions based upon alleged "policy considerations." Statutory drafting and policy making are the realm of the Congress. If the respondent believes that the broad scope expressed by the terms of the Holtzman Amendment was unintended by Congress or is otherwise inappropriate, then his recourse is to seek Congressional enactment of suitable limitations. We are charged with administering the existing statute, whose plain meaning encompasses all political opinion, including communism. Therefore, the respondent's proposed modification in the name of statutory construction is unwarranted.

In view of all the above, we conclude that communism is included within the term "political opinion" under the statute and that the actions

---

[20] We note too, for example, that in applying the persecution provisions of sections 101(a)(42), 208, and 243(h) of the Act in one recent case, we observed that even where an alien's persecution claim is based upon his Marxist-communist beliefs, this does not disqualify him for relief under the statute. *See Matter of Marroquin,* A19 870 798 (BIA March 23, 1982) n. 9. *aff'd sub nom., Marroquin-Manriquez v. INS,* 699 F.2d 129 (3 Cir. 1983) (App.).

of the respondent, the LPP, and the E.K.-2 were directed, at least in part, against persons solely because of their political opinion.

### (4) *Assisted or Otherwise Participated in Persecution*

The foregoing discussion relating to the first three elements of the statute demonstrates that the respondent was under the direction of, and associated with, the Nazi German Government and an arm of the government of occupied Latvia—the LPP—and that they engaged in persecution because of political opinion. The only remaining element which must be satisfied in order to establish the respondent's deportability under section 241(a)(19) is that requiring that he "assisted or otherwise participated in" this persecution.

The respondent argues that the issue of whether he assisted or participated in the persecution of communists requires that the Government prove the reasons and motivations for his actions and those of the LPP (*see* App. Br. at 194-95, 236, 243, 245). It is his contention that he and the LPP were motivated by considerations of patriotism, morality, and justice in seeking out and punishing the communist "traitors" of Latvia.[21] His argument suggests that his purpose was not to aid Nazi persecution, and that it would be unfair to find him deportable simply because his enemies—the enemies of all patriotic Latvians—were coincidentally Nazi enemies as well. In essence, the respondent urges that he be exempted from application of the statute because his intent was pure. For the reasons which follow, we find that the respondent's motivations and intent are irrelevant for purposes of section 241(a)(19) of the Act.

There apparently is no administrative or judicial case law construing the term "assisted" in proceedings under section 241(a)(19). However, in *Fedorenko* v. *United States*, 449 U.S. 490 (1981), the Supreme Court had occasion to contrue the same term as used in section 2(a) of the DPA, whose definition of "displaced persons" specifically excluded individuals who had "assisted" the enemy in persecuting civilians. *Id.* at 495, 509-10. The Supreme Court was confronted with a construction by the District Court which imposed a "voluntariness" requirement in connection with the "assisted" term—an attempt to engraft into it an "intent" element such as the respondent would have us do here. The Supreme Court concluded:

> Because we are unable to find any basis for an "involuntary assistance" exception in the language of 2(a), we conclude that the District Court's construction of the Act was incorrect. The plain language of the Act mandates precisely the literal interpretation that the District Court rejected: an individual's service as a concentration camp armed guard—whether voluntary or involuntary—made him ineligible for a visa. That Congress was perfectly capable of adopting a "voluntariness" limitation where it felt that

---

[21] We have already rejected the respondent's claim that he and the LPP dealt only with communist criminals. ·

one was necessary is plain from comparing § 2(a) with § 2(b) which excludes only those individuals who "*voluntarily* assisted the enemy forces . . . in their operations. . . ." Under traditional principles of statutory construction, the deliberate omission of the word "voluntary" from § 2(a) compels the conclusion that the statute made *all* those who assisted in the persecution of civilians ineligible for visas.

*Id.* at 512. We believe the same principle applies in this case as well.

Section 241(a)(19) and other provisions of the Holtzman Amendment contain no reference whatsoever to an alien's motivations and intent behind his assistance or participation in the specified persecution. On the other hand, Congress has qualified certain other provisions of the Immigration and Nationality Act with an intent element. *See, e.g.,* sections 212(a)(19); 212(a)(31); 215(a)(2), (3), (4), (5), and (7); 241(a)(6)(G); 241(a)(13); 257; 266(a), (c) and (d); 274; 275(3); 277. Moreover, the legislative history of the Holtzman Amendment (discussed earlier) shows that Congress carefully examined prior statutes relating to persons who engaged in persecution. Among these, for example, was the DPA, in which Congress also showed that it was capable of incorporating or omitting an intent/voluntariness requirement as it deemed appropriate. This demonstrates that Congress also knew how to incorporate a motivation/intent requirement in the Holtzman Amendment, yet it chose not to do so. Therefore, as in *Fedorenko*, we find that the plain language of the Amendment mandates a literal interpretation, and that the omission of an intent element compels the conclusion that section 241(a)(19) makes *all* those who assisted in the specified persecution deportable. Thus, the respondent's particular motivations or intent as is his alleged assistance and participation in persecution is not a relevant factor.

The respondent's attempt to engraft an intent element into the statute would seem to stem from his perception of a possible problem of over-inclusiveness resulting from a literal interpretation of its terms. However, as the Supreme Court noted in *Fedorenko:*

The solution to the problem perceived . . . lies not in "interpreting" the Act to include a voluntariness [or "intent"] requirement that the statute itself does not impose, but in *focusing on whether particular conduct can be considered assisting in the persecution of civilians.* Thus, an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems but we need decide only this case.

*Id.* at n. 34. (Emphasis supplied.) Following this lead, we reject the respondent's argument that his motivations should be considered, and we proceed to examine carefully whether his particular conduct can be considered as having "assisted" the LPP and/or the Nazis in the persecu-

tion of communists. In so doing, we look not to the respondent's subjective intent, but, rather, to the *objective effect* of his actions in deciding whether he assisted in the specified persecution.

On the facts of this case, we have little difficulty in concluding that the respondent did assist and otherwise participate in persecution by the LPP and the E.K.-2 because of political opinion. The following summary, principally of the respondent's own testimony, when viewed in the general context of information provided by other evidence and witnesses, clearly shows the role he played in assisting in persecution. The respondent worked as an investigator for the LPP, investigating "all kinds of communists" and exposing the communists who remained in Latvia after the German occupation. As an investigator, he obtained information about suspected communists which could lead to their arrest and imprisonment at RCP. He sometimes was authorized to decide when to make an actual arrest as well. The respondent also regularly interrogated communist prisoners from and at RCP. The information he obtained was used by his superiors to decide the fate of those prisoners. Such fate could include being sent to a concentration camp or being killed. These decisions were largely based on the "protocols" which he prepared following the interrogations. The respondent was a full-time, paid investigator of the LPP who was always armed. The respondent's immediate superior was one of the three or four section chiefs in the LPP who themselves were directly subordinate to LPP chief Teidemanis. This shows that the respondent's position in the LPP hierarchy was a lofty one, with but a handful of men higher in the organization. The very fact that he was personally interviewed by E.K.-2 chief Lange upon his resignation from the LPP demonstrates that his role in the LPP was not an unimportant one. Even his discharge certificate bears witness to the significant service he had provided to the Germans.

From the above, the respondent's assistance and participation in the LPP-Nazi persecution is clear. His role as an investigator and interrogator of communists of all kinds made him a necessary link between the LPP or E.K.-2 and the objects of their persecution. His efforts provided a vital skill in carrying out their policies. This is quite similar to the situation in *United States* v. *Osidach, supra* n. 2, at 98, where Osidach's role as a full-time, paid, and armed interpreter for the indigenous Ukrainian police units and Nazi Police was likewise held to constitute assistance of persecution because he provided a necessary link in the persecution chain. If anything, the respondent's role as a full-fledged officer in the LPP who personally conducted investigations o. communist suspects, questioning of witnesses, and interrogations of communist prisoners, presents an even stronger case of assistance than in *Osidach*. We conclude that the respondent did assist in the specified persecution. Thus, this fourth and last element of the statute is satisfied.

In view of all the foregoing, we find that the record establishes by clear, convincing, and unequivocal evidence that from 1941 to 1943, under the direction of, and in association with, both the LPP—an arm of the government of Nazi-occupied Latvia—and the Nazi German government, the respondent assisted and other wise participated in the persecution of persons because of political opinion. Therefore, the respondent is deportable under section 241(a)(19) of the Act.

### OTHER FORMS OF RELIEF

In the event that he were to be found deportable, the respondent made application for suspension of deportation under section 244(a)(1) of the Act, 8 U.S.C. 1254(a)(1), and, in the alternative, voluntary departure in lieu of deportation under section 244(e) of the Act. However, section 244(e), as amended by the 1978 Holtzman Amendment, precludes granting voluntary departure to aliens who are deportable under section 241(a)(19). Similarly, section 244(a)(1), as amended by Pub. L. 97-116, 18(h)(2), 95 Stat. 1611 (December 29, 1981), precludes granting suspension of deportation to aliens deportable under section 241(a)(19). Therefore, the respondent is ineligible for both suspension and voluntary departure relief, and those applications accordingly are denied.

### CONCLUSION

In summary, by virtue of the respondent's role and actions as an investigator and interrogator for the LPP, he thereby assisted in the persecution of persons because of political opinion as specified in section 241(a)(19) of the Act, and is therefore deportable on that basis. This finding makes it unnecessary for us to address the charge of deportability under section 241(a)(1). The respondent is also ineligible for relief under sections 244(a)(1) and 244(e) of the Act. Inasmuch as the immigration judge ordered these proceedings terminated, that order will be vacated, and the Government's appeal based upon the charge under section 241(a)(19) will be sustained.

ORDER: The decision of the immigration judge ordering the proceedings terminated is vacated, and the appeal is sustained.

FURTHER ORDER: The respondent shall be deported from the United States to Chile.[22]

---

[22] In the event he were ordered deported, the respondent designated Chile—his country of citizenship—as the country to which he be deported (Tr. p. 1121).