Justice Kennedy
delivered the opinion of the Court.
An alien who fears persecution in his homeland and seeks refugee status in this country is barred from obtaining that relief if he has persecuted others.
“The term ‘refugee’ does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.” Immigration and National *514 ity Act (INA), §101, 66 Stat. 166, as added by Refugee Act of 1980, § 201(a), 94 Stat. 102-103, 8 U. S. C. § 1101(a)(42).
This so-called “persecutor bar” applies to those seeking asylum, § 1158(b)(2)(A)(i), or withholding of removal, § 1231(b)(3)(B)(i). It does not disqualify an alien from receiving a temporary deferral of removal under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, p. 20, 1465 U. N. T. S. 85; 8 CFR § 1208.17(a) (2008).
In this ease the Board of Immigration Appeals (BIA) determined that the persecutor bar applies even if the alien’s assistance in persecution was coerced or otherwise the product of duress. In so ruling the BIA followed its earlier decisions that found Fedorenko v. United States, 449 U. S. 490 (1981), controlling. The Court of Appeals for the Fifth Circuit, in affirming the agency, relied on its precedent following the same reasoning. We hold that the BIA and the Court of Appeals misapplied Fedorenko. We reverse and remand for the agency to interpret the statute, free from the error, in the first instance.
I
Petitioner in this Court is Daniel Girmai Negusie, a dual national of Eritrea and Ethiopia, his father having been a national of the former and his mother of the latter. Born and educated in Ethiopia, he left there for Eritrea around the age of 18 to see his mother and find employment. The year was 1994. After a few months in Eritrea, state officials took custody of petitioner and others when they were attending a movie. He was forced to perform hard labor for a month and then was conscripted into the military for a time. War broke out between Ethiopia and Eritrea in 1998, and he was conscripted again.
*515 When petitioner refused to fight against Ethiopia, his other homeland, the Eritrean Government incarcerated him. Prison guards punished petitioner by beating him with sticks and placing him in the hot sun. He was released after two years and forced to work as a prison guard, a duty he performed on a rotating basis for about four years. It is undisputed that the prisoners he guarded were being persecuted on account of a protected ground — i. e., “race, religion, nationality, membership in a particular social group, or political opinion.” 8 U. S. C. § 1101(a)(42). Petitioner testified that he carried a gun, guarded the gate to prevent escape, and kept prisoners from taking showers and obtaining fresh air. He also guarded prisoners to make sure they stayed in the sun, which he knew was a form of punishment. He saw at least one man die after being in the sun for more than two hours. Petitioner testified that he had not shot at or directly punished any prisoner and that he helped prisoners on various occasions. Petitioner escaped from the prison and hid in a container, which was loaded on board a ship heading to the United States. Once here he applied for asylum and withholding of removal.
In a careful opinion the Immigration Judge, W. Wayne Stogner, found that petitioner’s testimony, for the most part, was credible. He concluded that petitioner assisted in persecution by working as an armed guard. The judge determined that although “there’s no evidence to establish that [petitioner] is a malicious person or that he was an aggressive person who mistreated the prisoners,. . . the very fact that he helped [the government] in the prison compound where he had reason to know that they were persecuted constitutes assisting in the persecution of others and bars [petitioner] from” obtaining asylum or withholding of removal. App. to Pet. for Cert. 16a-17a (citing, inter alia, Fedorenko, supra). The judge, however, granted deferral of removal under CAT because petitioner was likely to be tortured if returned to Eritrea.
*516 The BIA affirmed the denial of asylum and withholding. It noted petitioner’s role as an armed guard in a facility where “prisoners were tortured and left to die out in the sun ... on account of a protected ground.” App. to Pet. for Cert. 6a. The BIA held that “[t]he fact that [petitioner] was compelled to participate as a prison guard, and may not have actively tortured or mistreated anyone, is immaterial.” Ibid. That is because “‘an alien’s motivation and intent are irrelevant to the issue of whether he “assisted” in persecution .... [I]t is the objective effect of an alien’s actions which is controlling.’” Ibid, (quoting Matter of Fedorenko, 19 I. & N. Dec. 57,69 (BIA 1984)). The BIA also affirmed the grant of deferral of removal under CAT.
On petition for review the Court of Appeals agreed with the BIA that whether an alien is compelled to assist in persecution is immaterial for persecutor-bar purposes. Negusie v. Gonzales, 231 Fed. Appx. 325, 326 (2007) (per curiam) (citing Fedorenko, supra, at 512, n. 34). We granted certiorari. 552 U. S. 1255 (2008).
II
Consistent with the rule in Chevron U S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 842-843 (1984), the BIA is entitled to deference in interpreting ambiguous provisions of the INA. The question here is whether an alien who was compelled to assist in persecution can be eligible for asylum or withholding of removal. We conclude that the BIA misapplied our precedent in Fedorenko as mandating that an alien’s motivation and intent are irrelevant to the issue whether an alien assisted in persecution. The agency must confront the same question free of this mistaken legal premise.
A
JHris well settled that “principles of Chevron deference áre applicable to this statutory scheme.” INS v. Aguirre-Aguirre, 526 U. S. 415, 424 (1999). Congress has charged *517 the Attorney General with administering the INA, and a “ruling by the Attorney General with respect to all questions of law shall be controlling.” 8 U. S. C. § 1103(a)(1). Judicial deference in the immigration context is of special importance, for executive officials “exercise especially sensitive political functions that implicate questions of foreign relations.” INS v. Abudu, 485 U. S. 94, 110 (1988). The Attorney General’s decision to bar an alien who has participated in persecution “may affect our relations with [the alien’s native] country or its neighbors. The judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of such diplomatic repercussions.” Aguirre-Aguirre, 526 U. S., at 425.
The Attorney General, in turn, has delegated to the BIA the “ ‘discretion and authority conferred upon the Attorney General by law’ ” in the course of “ ‘considering and determining cases before it.’” Ibid, (quoting 8 CFR §3.1(d)(1) (1998)). As a consequence, “the BIA should be accorded Chevron deference as it gives ambiguous statutory terms ‘concrete meaning through a process of case-by-case adjudication.’” Aguirre-Aguirre, supra, at 425 (quoting INS v. Cardoza-Fonseca, 480 U. S. 421, 448-449 (1987)). When the BIA has not spoken on “a matter that statutes place primarily in agency hands,” our ordinary rule is to remand to “giv[e] the BIA the opportunity to address the matter in the first instance in light of its own expertise.” INS v. Orlando Ventura, 537 U. S. 12, 16-17 (2002) (per curiam).
B
The parties disagree over whether coercion or duress is relevant in determining if an alien assisted or otherwise participated in persecution. As there is substance to both contentions, we conclude that the statute has an ambiguity that the agency should address in the first instance.
Petitioner argues that the statute’s plain language makes clear that involuntary acts do not implicate the persecutor *518 bar because “‘persecution’” presumes moral blameworthiness. Brief for Petitioner 23-28. He invokes principles of criminal culpability, concepts of international law, and the rule of lenity. Id., at 28-45. Those arguments may be persuasive in determining whether a particular agency interpretation is reasonable, but they do not demonstrate that the statute is unambiguous. Petitioner all but conceded as much at argument in this Court when he indicated that the BIA has discretion to construe the duress defense in either a narrow or a broad way. Tr. of Oral Arg. 20-24.
The Government, on the other hand, asserts that the statute does not allow petitioner’s construction. “The statutory text,” the Government says, “directly answers that question: there is no exception” for conduct that is coerced because Congress did not include one. Brief for Respondent 11. We disagree. The silence is not conclusive. The question is whether the statutory text mandates that coerced actions must be deemed assistance in persecution. On that point the statute, in its precise terms, is not explicit. Nor is this a case where it is clear that Congress had an intention on the precise question at issue. Cf. Cardoza-Fonseca, supra, at 448-449.
The Government, like the BIA and the Court of Appeals, relies on Fedorenko to provide the answer. This reliance is not without some basis, as the Court there held that voluntariness was not required with respect to another persecutor bar. 449 U. S., at 512. To the extent, however, the Government deems Fedorenko to be controlling, it is in error.
In Fedorenko, the Court interpreted the Displaced Persons Act of 1948 (DPA), 62 Stat. 1009. The DPA was enacted “to enable European refugees driven from their homelands by the [second world] war to emigrate to the United States without regard to traditional immigration quotas.” 449 U. S., at 495. Section 2(b) of the DPA provides relief to “any displaced person or refugee as defined in Annex I of the Constitution of the International Refugee Organiza *519 tion” of the United Nations (IRO Constitution). 62 Stat. 1009. The IRO Constitution, as codified by Congress, excludes any individual “who can be shown: (a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or (b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations.” Annex I, Pt. II, §2, 62 Stat. 3051-3052.
The Fedorenko Court held that “an individual’s service as a concentration camp armed guard — whether voluntary or involuntary — made him ineligible for a visa” under §2(q) of the IRO Constitution. 449 U. S., at 512. That Congress did not adopt a voluntariness requirement for §2(q), the Court noted, “is plain from comparing §2(q) with § 2(5), which excludes only those individuals who ‘voluntarily assisted the enemy forces.’ ” Ibid. The Court relied on the principle of statutory construction that “the deliberate omission of the word ‘voluntary’ from §2(o) compels the conclusion that the statute made all those who assisted in persecution of civilians ineligible for visas.” Ibid.
Fedorenko does not compel the same conclusion in the case now before us. The textual structure of the statute in Fedorenko (“voluntary” is in one subsection but not the other) is not part of the statutory framework considered here. Congress did not use the word “voluntary” in any subsection of the persecutor bar, so its omission cannot carry the same significance.
The difference between the statutory scheme in Fedorenko and the one here is confirmed when we “ ‘look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.’ ” Dada v. Mukasey, 554 U. S. 1, 16 (2008) (quoting Gozlon-Peretz v. United States, 498 U. S. 395, 407 (1991)). Both statutes were enacted to reflect principles set forth in international agreements, but the principles differ in significant respects.
*520 As discussed, Congress enacted the DPA in 1948 as part of an international effort to address individuals who were forced to leave their homelands during and after the Second World War. Fedorenko, supra, at 495. The DPA excludes those who “voluntarily assisted the enemy forces since the outbreak of the second world war,” 62 Stat. 3052, as well as all who “assisted the enemy in persecuting civil populations of countries,” id., at 3051. The latter exclusion clause makes no reference to culpability. The exclusion of even those involved in nonculpable, involuntary assistance in Nazi persecution, as an expert testified in Fedorenko, may be “‘[because the crime against humanity that is involved in the concentration camp puts it into a different category.’ ” 449 U. S., at 511, n. 32.
The persecutor bar in this case, by contrast, was enacted as part of the Refugee Act of 1980. Unlike the DPA, which was enacted to address not just the postwar refugee problem but also the Holocaust and its horror, the Refugee Act was designed to provide a general rule for the ongoing treatment of all refugees and displaced persons. As this Court has twice recognized, “‘one of Congress’ primary purposes’ in passing the Refugee Act was to implement the principles agreed to in the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U. S. T. 6224, T. I. A. S. 6577 (1968),” as well as the “United Nations Convention Relating to the Status of Refugees, 189 U. N. T. S. 150 (July 28,1951), reprinted in 19 U. S. T. 6259.” Aguirre-Aguirre, 526 U. S., at 427 (quoting Cardoza-Fonseca, 480 U. S., at 436-437).
These authorities illustrate why Fedorenko, which addressed a different statute enacted for a different purpose, does not control the BIA’s interpretation of this persecutor bar. Whatever weight or relevance these various authorities may have in interpreting the statute should be considered by the agency in the first instance, and by any subsequent reviewing court, after our remand.
*521 c
The Government argues that “if there were any ambiguity in the text, the Board’s determination that the bar contains no such exception is reasonable and thus controlling.” Brief for Respondent 11. Whether such an interpretation would be reasonable, and thus owed Chevron deference, is a legitimate question; but it is not now before us. The BIA deemed its interpretation to be mandated by Fedorenko, and that error prevented it from a full consideration of the statutory question here presented.
In denying relief in this case the BIA recited a rule that has developed in its own case law in reliance on Fedorenko: “[A]n alien’s motivation and intent are irrelevant to the issue of whether he ‘assisted’ in persecution.... [I]t is the objective effect of an alien’s actions which is controlling.” App. to Pet. for Cert. 6a. The rule is based on three earlier decisions: Matter of Laipenieks, 18 I. & N. Dec. 433 (1983); Matter of Fedorenko, 19 I. & N. Dec. 57; and Matter of Rodriguez-Majano, 19 I. & N. Dec. 811 (1988).
In Matter of Laipenieks, the BIA applied the Court’s Fedorenko analysis of the DPA to a different postwar statute, which provided for the deportation of anyone associated with the Nazis who “ordered, incited, assisted, or otherwise participated” in persecution based on a protected ground. 8 U. S. C. § 1182(a)(3)(E)(i). Finding no agency or judicial decision on point, the BIA relied on Fedorenko. It recognized that the unique structure of the Fedorenko statute was not present in § 1182(a)(3)(E)(i), but the BIA nevertheless adopted wholesale the Fedorenko rule: “[A]s in Fedorenko, ... the plain language of [§ 1182(a)(3)(E)(i)] mandates a literal interpretation, and the omission of an intent element compels the conclusion that [§ 1182(a)(3)(E)(i)] makes all those who assisted in the specific persecution deportable.” 18 I. & N. Dec., at 464 (emphasis deleted). In other words, “particular motivations or intent ... is not a relevant factor.” Ibid.
*522 The second decision, Matter of Fedorenko, also dealt with § 1182(a)(3)(E)(i), and it involved'the same alien whose citizenship was revoked by this Court’s Fedorenko decision. This time the agency sought to deport him. Fedorenko responded by requesting suspension of deportation. He argued that, unlike the DPA’s bar on any assistance — voluntary or involuntary — in persecution, see Fedorenko, supra, at 512, the text and structure of § 1182(a)(3)(E)(i) required deportation only of those who voluntarily assisted in persecuting others. The BIA rejected that distinction, noting that it was foreclosed by Matter of Laipenieks: “It may be, as [Fedorenko] argues, that his service at Treblinka was involuntary. ... We need not resolve the issue, however, because as a matter of law [Fedorenko’s] motivations for serving as a guard at Treblinka are immaterial to the question of his deportability under” § 1182(a)(3)(E)(i). 19 I. & N. Dec., at 69-70.
Later, the BIA applied this Court’s Fedorenko rule to the persecutor bar that is at issue in the present case. In Matter of Rodriguez-Majano, the BIA granted relief because the alien’s coerced conduct as a guerrilla was not persecution based on a protected ground. 19 I. & N. Dec., at 815-816. Nevertheless, in reaching its conclusion the BIA incorporated without additional analysis the Fedorenko rule as applied in Matter of Laipenieks and reiterated in Matter of Fedorenko. 19 I. & N. Dec., at 814-815. The BIA reaffirmed that “[t]he participation or assistance of an alien in persecution need not be of his own volition to bar him from relief.” Id., at 814 (citing Fedorenko, 449 U. S. 490).
Our reading of these decisions confirms that the BIA has not exercised its interpretive authority but, instead, has determined that Fedorenko controls. This mistaken assumption stems from a failure to recognize the inapplicability of the principle of statutory construction invoked in Fedorenko, as well as a failure to appreciate the differences in statutory purpose. The BIA is not bound to apply the Fedorenko rule *523 that motive and intent are irrelevant to the persecutor bar at issue in this case. Whether the statute permits such an interpretation based on a different course of reasoning must be determined in the first instance by the agency.
Ill
Having concluded that the BIA has not yet exercised its Chevron discretion to interpret the statute in question, “ ‘ “the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.”’” Gonzales v. Thomas, 547 U. S. 183, 186 (2006) (per curiam) (quoting Ventura, 537 U. S., at 16, in turn quoting Florida Power & Light Co. v. Lorion, 470 U. S. 729, 744 (1985)). This remand rule exists, in part, because “ambiguities in statutes within an agency’s jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps . . . involves difficult policy choices that agencies are better equipped to make than courts.” National Cable & Telecommunications Assn. v. Brand X Internet Services, 545 U. S. 967, 980 (2005).
Justice Stevens would have the Court provide a definite answer to the question presented and then remand for further proceedings. That approach, however, is in tension with the “ordinary ‘remand’ rule.” Ventura, supra, at 18; see also Cajun Elec. Power Cooperative, Inc. v. FERC, 924 F. 2d 1132, 1136 (CADC 1991) (opinion for the court by Silberman, J., joined by R. Ginsburg and Thomas, JJ.) (“[I]f an agency erroneously contends that Congress’ intent has been clearly expressed and has rested on that ground, we remand to require the agency to consider the question afresh in light of the ambiguity we see”). Thomas is illustrative. There, the agency had not determined whether a family may constitute a social group for the purposes of refugee status. The Ninth Circuit held that the family can constitute a protected social group and that the particular family at issue did qualify. 547 U. S., at 184-185. The Solicitor General sought re *524 view in this Court on “whether the Ninth Circuit erred in holding, in the first instance and without prior resolution of the questions by the relevant administrative agency, that members of a family can and do constitute a particular social group, within the meaning of the Act.” Id., at 185 (internal quotation marks omitted). He argued that the Ninth Circuit’s decision violated the Ventura ordinary remand rule. We agreed and summarily reversed. 547 U. S., at 184-185.
Ventura and Thomas counsel a similar result here. Because of the important differences between the statute before us and the one at issue in Fedorenko, we find it appropriate to remand to the agency for its initial determination of the statutory interpretation question and its application to this case. The agency’s interpretation of the statutory meaning of “persecution” may be explained by a more comprehensive definition, one designed to elaborate on the term in anticipation of a wide range of potential conduct; and that expanded definition in turn may be influenced by how practical, or impractical, the standard would be in terms of its application to specific cases. These matters may have relevance in determining whether its statutory interpretation is a permissible one.
As the Court said in Ventura and reiterated in Thomas, “ ‘[t]he agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides.’” 547 U. S., at 186-187 (quoting Ventura, supra, at 17). If the BIA decides to adopt a standard that considers voluntariness to some degree, it may be prudent and necessary for the Immigration Judge to conduct additional factfinding based on the new standard. Those determinations are for the agency to make in the first instance.
*525 * * *
We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

It is so ordered.