[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-10445

_____

ESMELDA RUIZ,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A096-091-552

_____

Before JILL PRYOR, NEWSOM, and GRANT, Circuit Judges.

NEWSOM, Circuit Judge:

Esmelda Ruiz, a native and citizen of Peru, appeals the Board of Immigration Appeals' determination that she is ineligible for relief under 8 U.S.C. § 1229b(b)(2), a provision whose language was originally adopted as part of the Violence Against Women Act of 1994 and that outlines the conditions under which certain "battered spouse[s] or child[ren]" qualify for discretionary cancellation of removal. As relevant here, it requires a petitioning alien to show that she "has been battered or subjected to extreme cruelty" by her spouse or parent. 8 U.S.C. § 1229b(b)(2)(A)(i).

Ruiz contends that the Immigration Judge and the BIA made two errors in refusing her cancellation request. First, she maintains that, as a matter of law, they misinterpreted the statutory term "extreme cruelty" to require proof of physical—as distinguished from mental or emotional—abuse. And second, she asserts that, having misread the law, the IJ and the BIA wrongly concluded that she doesn't qualify for discretionary relief.

We agree with Ruiz that the IJ and the BIA misinterpreted § 1229b(b)(2) and thereby applied an erroneous legal standard in evaluating her request for cancellation of removal. Accordingly, we grant her petition for review and remand to the BIA for further consideration.

**I**

**A**

Esmelda Ruiz entered the United States with her son on a six-month nonimmigrant visa in 2001. Shortly thereafter, she married Gavin Blanco. Only a year into her marriage, Ruiz was diagnosed with breast cancer. She received chemotherapy and, as a result, lost her hair and broke out in hives. Ruiz testified that following her diagnosis Blanco's attitude toward her changed, and he became "rude" and "obnoxious." He told her that "if they remove[d] [her] breast, that was the end of it." After she underwent a mastectomy, he "got [her] out of [the] bed" in "a cruel way," grabbed her arm, forced her in front of a mirror, and said, "You are not a woman for me anymore." Ruiz's son, Cristian, corroborated that incident and testified that, in general, Blanco "scream[ed] at" her. Cristian also reported that he once heard "something break" while Ruiz and Blanco were arguing.

Following Ruiz's mastectomy, Blanco filed for divorce, sought a restraining order against her, and, she says, took $2,500 from their joint bank account. Save for the one instance in which he grabbed her arm, Ruiz has not alleged that Blanco physically abused her. She has alleged, however, that as a result of Blanco's treatment of her, she suffered from post-traumatic stress disorder and required psychotherapy. Happily, Ruiz is now cancer-free.

**B**

In 2009, the government initiated removal proceedings against Ruiz on the ground that she had long overstayed the six months that her nonimmigrant visa allowed her to stay in the United States.[1] She filed for cancellation of removal under 8 U.S.C. § 1229b(b)(2), which is titled "Special rule for battered spouse or child." The cancellation proceedings have been ongoing ever since.

Congress enacted what is now § 1229b(b)(2) as part of the Violence Against Women Act to enable certain victims of domestic abuse to obtain discretionary deportation relief. *See Bedoya-Melendez v. U.S. Att'y Gen.*, 680 F.3d 1321, 1326 (11th Cir. 2012), *overruled on other grounds by Patel v. U.S. Att'y Gen.*, 971 F.3d 1258, 1278 (11th Cir. 2020) (en banc). To qualify for cancellation of removal under § 1229b(b)(2), an alien must establish five prerequisites: (1) that she has been "battered or subjected to extreme cruelty" by a spouse or parent; (2) that she has been continuously present in the United States for at least three years immediately preceding her application; (3) that she has been a person of good moral character during that period; (4) that she doesn't have any disqualifying criminal convictions or other specified grounds of inadmissibility or deportability; and (5) that removal would result in extreme hardship to her, her child, or her parent. 8 U.S.C. § 1229b(b)(2)(A)(i)–(v). The lone

---

[1] Ruiz had earlier applied to adjust her immigration status based on her marriage to Blanco, but her application was denied on the ground that she had married "for the primary purpose of circumventing the immigration laws of the United States."

dispute here is whether Ruiz was "battered or subjected to extreme cruelty" within the meaning of the statute.

The IJ concluded that although Ruiz met the statute's other requirements, she hadn't been "battered or subjected to extreme cruelty." He explained his determination as follows:

> Even taking into account Cristian's testimony that Respondent and Mr. Blanco would often fight after she was diagnosed with cancer, and that he once heard something break when they were fighting, there is still no indication of physical violence or physical harm to Respondent. Additionally, Respondent has failed to submit any documentary evidence that supports her contention of abuse, aside from her own written statement and a letter from a mental health counselor stating that she is attending psychotherapy sessions as of July 2015 as "ordered" by the court and that she suffers from posttraumatic stress disorder. Both of these documents fail to indicate additional facts of physical abuse or violent harm that would support Respondent's claims.

Ruiz appealed the IJ's decision to the BIA. Specifically, she argued that the IJ improperly interpreted § 1229b(b)(2)'s phrase "extreme cruelty" to require proof of physical violence and to exclude mental or emotional abuse. In a non-precedential single-judge order, the BIA "adopt[ed] and affirm[ed]" the IJ's decision and expressly "disagree[d] that the [IJ] used the wrong standard in this case." The BIA went on to explain itself as follows:

[W]e concur with the Immigration Judge that the respondent did not establish extreme cruelty at the hands of her former husband. The primary issue here is that the respondent's former husband abandoned the respondent once she became ill. He was no longer willing to act in support of the respondent and made hurtful comments to her about this fact. His rejection of her when she was ill and especially after her mastectomy is exceedingly unfortunate. However, this kind of abandonment is not the type of treatment that we generally consider to be "extreme cruelty" for purposes of the VAWA. *See Matter of A-M-*, 25 I&N Dec. 66, 72 (BIA 2009) (explaining that "[a]ccording to the legislative history, the purpose of the VAWA provisions amending the Act was to permit battered spouses to leave their abusers without fear of deportation or other immigration consequences.").

The Immigration Judge properly considered the "insults and lack of support [the respondent] endured during such a difficult time." Like the Immigration Judge, we are not unsympathetic with the respondent's situation. Nevertheless, we concur that the respondent did not establish eligibility for cancellation of removal under the VAWA.

Ruiz timely petitioned this Court for review of the BIA's decision.

## II

First things first:  The government contends that we lack jurisdiction over Ruiz's petition under 8 U.S.C. § 1252(a)(2).  That statute contains two relevant subsections.  The first is a jurisdiction-stripping provision.  In pertinent part, it states that "[n]otwithstanding any other provision of law . . . no court shall have jurisdiction to review . . . any judgment regarding the granting of relief under section . . . 1229b . . . of this title."  *Id*. § 1252(a)(2)(B)(i).  The second, as relevant here, preserves jurisdiction over "questions of law":  "Nothing in subparagraph (B) . . . which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review . . . ."  *Id*. § 1252(a)(2)(D).

In support of its jurisdictional argument, the government cites our decision in *Bedoya-Melendez v. U.S. Attorney General*, in which we held that § 1252(a)(2) precludes review of the BIA's determination whether an alien qualifies for relief under § 1229b(b)(2).  *See* 680 F.3d 1321, 1325–28 (11th Cir. 2012).  Sitting en banc, though, we recently overruled *Bedoya-Melendez* in *Patel v. U.S. Attorney General*, 971 F.3d 1258, 1278 (11th Cir. 2020) (en banc).  The Supreme Court thereafter granted certiorari in *Patel* and affirmed our decision.  *See Patel v. Garland*, 142 S. Ct. 1614 (2022).  Importantly for present purposes, in so doing, the Supreme Court echoed the distinction that we had drawn between questions of fact, over which we lack jurisdiction, and questions of law, over which we retain it.  *See id.* at 1623.

It remains to apply § 1252(a)(2)'s fact-law distinction—and the logic of *Patel*—to each of Ruiz's two challenges. We conclude that we have jurisdiction to consider Ruiz's threshold contention that the IJ and BIA misinterpreted § 1229b(b)(2) to require proof of physical abuse as a precondition to showing "extreme cruelty." To be sure, "part[ies] may not dress up a claim with legal or constitutional clothing to invoke our jurisdiction." *Patel*, 971 F.3d at 1272. But Ruiz's first argument—about "the meaning of a statutory . . . provision"—presents a quintessential "question of law." *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1258 (11th Cir. 2004) (distinguishing purely legal questions from questions about "the application of settled law to fact").

Having said that, whether Ruiz's particular case meets the statutory standard is *not* a reviewable "question of law." As we held in *Patel*, "all eligibility determinations for the five enumerated categories of discretionary relief" in § 1252(a)(2)(B)(i) "are barred from review." 971 F.3d at 1279. Section 1229b is one of the five "enumerated categories of discretionary relief" that *Patel* described—it provides that "the Attorney General *may* cancel removal" provided that certain prerequisites are satisfied. 8 U.S.C. § 1229b(b)(2)(A) (emphasis added). In *Patel*, we squarely rejected the petitioner's contention that eligibility determinations are necessarily reviewable questions of law. 971 F.3d at 1279. So too here, we lack jurisdiction to consider Ruiz's fact-based contention that the circumstances of her case qualify her for relief under § 1229b(b)(2).

Accordingly, we conclude that we have jurisdiction to consider Ruiz's purely legal challenge to the BIA's interpretation of § 1229b(b)(2) but that we lack jurisdiction to decide her claim that the facts of her case qualify her for discretionary relief.

### III

We proceed, then, to consider Ruiz's contention that the BIA misinterpreted the phrase "extreme cruelty" in § 1229b(b)(2) to require proof of physical abuse.

### A

As an initial matter, the parties dispute whether the BIA so construed the statute: Ruiz, of course, contends that it did; the government insists that it didn't. Needless to say, if the government is right, and in fact the BIA didn't interpret the term "extreme cruelty" to require proof of physical abuse, then we needn't consider whether such an interpretation would be improper. For reasons we will explain, though, we agree with Ruiz that the BIA's decision is best understood to impose the sort of physical-abuse prerequisite about which she complains.

Because the BIA expressly "adopt[ed] and affirm[ed] the Immigration Judge's decision," we begin with the IJ's opinion. *See, e.g.*, *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1308 (11th Cir. 2013) (holding that when the BIA's decision adopts the IJ's, we review both). It seems perfectly clear to us that the IJ imposed a physical-abuse requirement. Here's the key paragraph of the IJ's opinion once again, this time with our emphasis:

Even taking into account Cristian's testimony that Respondent and Mr. Blanco would often fight after she was diagnosed with cancer, and that he once heard something break when they were fighting, *there is still no indication of physical violence or physical harm to Respondent*. Additionally, Respondent has failed to submit any documentary evidence that supports her contention of abuse, aside from her own written statement and a letter from a mental health counselor stating that she is attending psychotherapy sessions as of July 2015 as "ordered" by the court and that she suffers from posttraumatic stress disorder. *Both of these documents fail to indicate additional facts of physical abuse or violent harm that would support Respondent's claims*.

By its terms, the IJ's opinion requires a petitioner to come forward with proof of "physical violence," "physical harm," or "physical abuse" in order to meet § 1229b(b)(2)'s "extreme cruelty" standard.

The BIA's summary, 1½-page opinion leaves a lot to be desired and, to boot, sends mixed messages regarding the meaning of "extreme cruelty." On the one hand, the BIA said that "[t]he primary issue . . . is that [Blanco] abandoned [Ruiz] once she became ill," refused to "support" her, "made hurtful comments to her," and "reject[ed] her when she was ill"—and that "this kind of abandonment is not the type of treatment that we generally consider to be 'extreme cruelty' for purposes of the VAWA." Those comments might be understood to suggest that while non-physical, emotional abuse can generally suffice to establish "extreme cruelty" within

the meaning of § 1229b(b)(2), the particular mistreatment that Ruiz suffered doesn't qualify. On the other hand, though, the BIA cited one of its earlier decisions referring to the "purpose of the VAWA"—of which, again, § 1229b(b)(2)'s operative language was part—as protecting "battered spouses." That invocation would seem to indicate a focus on physical abuse.

In any event, the BIA ultimately, and explicitly, "adopt[ed] and affirm[ed]" the IJ's decision—which, as we have explained, clearly interpreted the term "extreme cruelty" to require a showing of physical violence, harm, or abuse—and expressly "disagree[d] that the Immigration Judge used the wrong standard." Accordingly, we conclude that the BIA's opinion is best understood, like the IJ's opinion that it affirms, to require a showing of physical abuse as a prerequisite to a finding of "extreme cruelty."

**B**

We come, then, to the pivotal legal question that underlies Ruiz's petition: Is the term "extreme cruelty" in § 1229b(b)(2) properly interpreted to require proof of physical violence and to exclude mental or emotional abuse? And because we are reviewing the BIA's interpretation, we must first consider a threshold question: Is the BIA's reading of the statute entitled to deference, and, if so, what kind?

**1**

In its brief to us, the government urged us to defer to the BIA's interpretation under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). As we pointed out to the parties

in a pre-argument notice, however, the BIA's decision in this case is memorialized in a non-precedential single-member order. And we have been clear that such an order merits *Chevron* deference *only* when it "relie[s] on" existing federal-court or BIA precedent—and, in turn, that such an order will be deemed to "rel[y] on" existing precedent *only* when it is "actually dictated" or "compelled" by that precedent. *See Barton v. U.S. Att'y Gen.*, 904 F.3d 1294, 1302 n.5 (11th Cir. 2018) (citing *Quinchia v. U.S. Att'y Gen.*, 552 F.3d 1255 (11th Cir. 2008)), *aff'd sub nom. Barton v. Barr*, 140 S. Ct. 1442 (2020).

As already noted, the BIA's order here does cite one of its earlier decisions, as follows: "*See Matter of A-M-*, 25 I&N Dec. 66, 72 (BIA 2009) (explaining that '[a]ccording to the legislative history, the purpose of the VAWA provisions amending the Act was to permit battered spouses to leave their abusers without fear of deportation or other immigration consequences.')." The question for *Chevron* purposes, therefore, is whether the BIA's interpretation of § 1229b(b)(2) in this case was "actually dictated" or "compelled" by *Matter of A-M-*. *See Barton*, 904 F.3d at 1302 n.5. It was not. *Matter of A-M-* held (1) that lawful permanent residents are eligible for § 1229b(b)(2) relief but (2) that a woman who had already escaped an abusive relationship didn't qualify because VAWA's "purpose" was to "enable aliens to leave their abusive citizen or lawful permanent resident spouses who may use the threat of deportation or sponsorship for an immigration benefit to maintain control over them." *Matter of A-M-*, 25 I. & N. Dec. at 76–78. As the government has acknowledged, the issues there had little (if anything) to do

22-10445                Opinion of the Court                13

with those here, and they certainly didn't dictate or compel the BIA's decision in this case.[2]

So, no *Chevron* deference. In *Chevron*'s absence, we review the BIA's decision through the lens of *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), and "defer" to it only to the extent that it has the "power to persuade." *Quinchia*, 552 F.3d at 1259 (quoting *Skidmore*,

---

[2] To its credit, when confronted at oral argument with *Barton* and *Quinchia*, the government abandoned its contention that the BIA's single-judge order in this case warrants *Chevron* deference:

> **The Court:** Do you think this single-member, unpublished BIA opinion is entitled to *Chevron* deference?
>
> **Government:** No, your Honor. As you discussed previously, in order for a single-board-member decision to get *Chevron* deference, that decision either needs to rely on a precedential Board decision or a precedential Board decision [needs to be] subsequently issued.
>
> **Court:** So you acknowledge that the citation to *Matter of A-M-* in the BIA's decision is not reliance, as we described in *Barton* and *Quinchia*—not good enough, and so we are out of *Chevron* and into *Skidmore.*
>
> **Government:** Correct, your Honor. Because while *Matter of A-M-* supports the Board's decision, it does not control or dictate the outcome, which would be necessary for this case to merit *Chevron* deference.

Oral Arg. at 13:30–14:25.

323 U.S. at 140); *accord Serrano v. U.S. Att'y Gen.*, 655 F.3d 1260, 1266 (11th Cir. 2011).[3]

**2**

At last, therefore, the merits of the interpretive question. For the reasons that follow, we find ourselves un-"persuade[d]," *see Skidmore*, 323 U.S. at 140, by the BIA's reading of § 1229b(b)(2) to require proof of physical abuse as a prerequisite to "extreme cruelty."

VAWA-era dictionary definitions[4] demonstrate that the term "cruelty" both (1) has an ordinary meaning that generally entails both physical and mental abuse and (2) more specifically, is a term of art in the family-law context that plainly encompasses both.

---

[3] There is one loose *Chevron*-related end. The portion of the Immigration and Nationality Act that includes § 1229b is subject to a general provision, 8 U.S.C. § 1103(a)(1), which states, in part, that "determination[s] and ruling[s] by the Attorney General with respect to all questions of law shall be controlling." Although, on one reading, § 1103(a)(1) might appear on its face to embody a freestanding rule of deference (or even obeisance) to BIA interpretations of immigration-related statutes, in practice the provision has been cited only as a basis for applying ordinary *Chevron* principles. *See, e.g., Negusie v. Holder*, 555 U.S. 511, 517 (2009); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424–25 (1999); *Amezcua-Preciado v. U.S. Att'y Gen.*, 943 F.3d 1337, 1341–42 (11th Cir. 2019). As we have already explained—and as the government concedes—*Chevron* deference doesn't apply in this case, and no one has suggested that § 1103(a)(1) does anything to change that. *See* Oral Arg. at 25:00–25:30 (government's lawyer conceding that § 1103(a)(1) doesn't require deference independently of, or in addition to, *Chevron*).

[4] Congress enacted the Violence Against Women Act—and again, the language later recodified in § 1229b(b)(2)—in 1994.

Here, for instance, is how the Sixth Edition of *Black's* defines "cruelty":

> The intentional and malicious infliction of physical or *mental suffering* upon living creatures, particularly human beings; or, as applied to the latter, the wanton, malicious, and unnecessary infliction of pain upon the body, or *the feelings and emotions*; abusive treatment; inhumanity; outrage. Chiefly used in the law of divorce, in such phrases as "cruel and abusive treatment," "cruel and barbarous treatment," or "cruel and inhuman treatment." *In domestic relations, term includes mental injury as well as physical.*

*Cruelty*, Black's Law Dictionary 377 (6th ed. 1990) (emphasis added) (internal citations omitted). *Webster's Third* says much the same thing. As particularly relevant here, it defines the term "cruelty" to mean the "[c]onduct of either party in a divorce action that endangers the life or health of the other; *also: acts that cause mental suffering or fear*." *Cruelty*, Webster's Third New International Dictionary 186 (1981) (emphasis added).

Even more to the point, *Black's* defines the full statutory phrase "extreme cruelty" as a term of art that denotes a ground for divorce and that specifically includes mental injury:

> Extreme cruelty: As grounds for divorce, may consist of personal injury or physical violence *or it may be acts or omissions of such character as to destroy peace of mind or impair bodily or mental health of person upon whom inflicted* or be such as to destroy the objects of matrimony.

*Extreme Cruelty*, Black's Law Dictionary, *supra* at 588 (emphasis added).

The ordinary meaning of the term "cruelty" and the term-of-art understanding of the phrase "extreme cruelty" not only corroborate one another, but are also themselves corroborated by evidence from the larger corpus juris. Ruiz, for instance, points to 8 C.F.R. § 204.2(c)(1)(vi). Although that regulation was promulgated under different statutes, 8 U.S.C. §§ 1154 and 1255, it defines an almost identical phrase, "[b]attery or extreme cruelty." *Cf. Bedoya-Melendez*, 680 F.3d at 1326–28. It says, with our emphasis added—

> For the purpose of this chapter, the phrase "was battered by or was the subject of extreme cruelty" includes, but is not limited to, being the victim of any act or threatened act of violence, including any forceful detention, which results or threatens to result in physical or mental injury. *Psychological* or sexual *abuse* or exploitation, including rape, molestation, incest (if the victim is a minor), or forced prostitution *shall be considered acts of violence*.

8 C.F.R. § 204.2(c)(1)(vi). The regulation thus expressly defines the phrase "was battered or was the subject of extreme cruelty" to include "act[s] of violence" and, in turn, expressly defines the phrase "act[s] of violence" to include "[p]sychological . . . abuse." Again, § 204.2(c)(1)(vi) applies by its terms only to the particular chapter of the C.F.R. under which it was promulgated, but it confirms the plain-language understanding of the term "extreme cruelty" as encompassing mental and emotional abuse.

As does 42 U.S.C. § 608, even if from somewhat further afield. That statute prescribes certain conditions regarding federal grants to states providing welfare assistance to needy families. One of its provisions generally prohibits a state from using federal funds to assist a family for more than five years. *Id*. § 608(a)(7)(A). It carves out an exception, though, for families that include an individual who has been "battered or subjected to extreme cruelty." *Id*. § 608(a)(7)(C)(i). The statute, in turn, expressly "define[s]" that phrase to include not only "physical acts" that threaten or result in "physical injury" but also, as relevant here, "mental abuse." *Id*. § 608(a)(7)(C)(iii)(I)–(VI).

The evidence, we think—both textual and contextual—overwhelmingly demonstrates that the term "extreme cruelty" is best understood to include mental and emotional, as well as physical, abuse. We therefore conclude that the BIA's contrary interpretation is unpersuasive, undeserving of *Skidmore* deference, and erroneous.

## IV

For the foregoing reasons, we agree with Ruiz—and hold—that the BIA misinterpreted 8 U.S.C. § 1229b(b)(2). The term "extreme cruelty" does not require a petitioning alien to prove that she suffered physical abuse in order to qualify for discretionary cancellation of removal; proof of mental or emotional abuse is sufficient to satisfy the "extreme cruelty" prong of § 1229b(b)(2)'s five-prong

standard.  We therefore **GRANT** the petition in part and **REMAND** to the BIA for further proceedings consistent with this opinion.[5]

---

[5] Because we lack jurisdiction to decide whether the facts of Ruiz's particular case satisfy the correct legal standard, we express no view on that question. *See supra* at 9.

22-10445                 Newsom, J., Concurring                 1

NEWSOM, Circuit Judge, concurring:

I'd like to briefly investigate the curious case of 8 U.S.C. § 1103(a)(1). As the majority opinion explains, *see* Maj. Op. at 14 n.3, that subsection—and in particular its concluding proviso "[t]hat determination[s] and ruling[s] by the Attorney General with respect to all questions of law shall be controlling"—has traditionally been cited as support for the ho-hum proposition that principles of *Chevron* deference apply in immigration-related cases. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999) ("It is clear that principles of *Chevron* deference are applicable to this statutory scheme. The INA provides that . . . the 'determination and ruling by the Attorney General with respect to all questions of law shall be controlling.' 8 U.S.C. § 1103(a)(1) (1994 ed., Supp. III)."); *accord, e.g., Negusie v. Holder*, 555 U.S. 511, 517 (2009) (same). That, it seems to me, is the one thing that § 1103(a)(1) almost certainly does *not* mean. Let me explain.

Here's § 1103(a)(1)'s full text:

**(a) Secretary of Homeland Security**

**(1)** The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however, That determination and ruling by*

> *the Attorney General with respect to all questions of law*
> *shall be controlling.*

8 U.S.C. § 1103(a)(1) (emphasis added).

The way I see it, there are two plausible readings of § 1103(a)(1)'s proviso. First, it could mean that the Attorney General's legal determinations are "controlling" vis-à-vis the other Executive Branch officials mentioned in § 1103(a)(1)—the President, Secretary of State, diplomatic and consular officers, etc. On that understanding, the proviso has nothing to say about—nothing to do with—the question of how *reviewing courts* should treat the Attorney General's legal determinations. Second, the proviso could (at least as a linguistic matter) mean that the Attorney General's legal determinations are "controlling" more generally—including on the judiciary. For reasons I'll explain, the former seems to me the far more natural reading; the latter seems both strained and quite likely unconstitutional.

## I

Before we get there, though, what about the mushy-middle, in-between interpretation that some of the Supreme Court's citations would appear to suggest—*i.e.*, that § 1103(a)(1)'s proviso is just support (code, really) for the application of ordinary *Chevron*-deference principles? That reading, I submit, is neither convincing as a matter of semantics nor sensible in the larger scheme of administrative law.

As for language, here's how *Black's* defined the word "control" when § 1103(a)(1) was enacted: "To exercise restraining or

directing influence over. To regulate; restrain; dominate; curb; to hold from action; overpower; counteract; govern." *Control*, Black's Law Dictionary 329 (6th ed. 1990). That hardly describes the *Chevron* inquiry. Under *Chevron*'s familiar framework, a reviewing court must first decide whether a particular statute is ambiguous and then, if it is, assess the agency's interpretation to determine whether it represents a "permissible," "reasonable" reading—and then, if it does, but *only* if it does, defer to it. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984). Ultimately, the courts are in charge; they exercise "directing influence" over agencies, not the other way around. Not even the most ardent *Chevron* enthusiast would contend that it requires a court not just to defer to an agency's interpretation, but to mindlessly acquiesce in it.

Moreover, understood as a directive that reviewing courts should give the Attorney General's legal determinations ordinary *Chevron* deference, § 1103(a)(1) is superfluous—effectively meaningless. Presumably, the Board of Immigration Appeals—as the Attorney General's designee for immigration-related adjudications—either is or isn't entitled to *Chevron* deference to the same extent that any other administrative agency is. But that's a determination made by reference to the usual administrative-law criteria—for example, whether the agency has been either explicitly or implicitly delegated authority to interpret a particular statute, *see Chevron*, 467 U.S. at 843–44, and whether the regulation or adjudication in question has "the force of law," *United States v. Mead Corp.*, 533 U.S. 218, 231–32 (2001). And indeed, that's exactly how the Supreme Court

has often approached the question of *Chevron* deference in immigration-related cases—*i.e.*, by diving right in, rather than pausing to check the § 1101(a)(3) box. *See, e.g.*, *Mellouli v. Lynch*, 575 U.S. 798 (2015) (declining to defer under *Chevron* to the BIA's interpretation of 8 U.S.C. § 1227(a)(2)(B)(i) without reference to § 1103(a)(1)); *Scialabba v. Cuellar de Osorio*, 573 U.S. 41 (2014) (deferring under *Chevron* to the BIA's interpretation of 8 U.S.C. § 1153 without reference to § 1103(a)(1)).[1]   The Court has bypassed § 1103(a)(1) for good reason—as I'll explain next, whatever else it is, § 1103(a)(1) is *not* an explicit (or even implicit) delegation of general interpretive authority to the Attorney General or his designees vis-à-vis the courts.

## II

So we know—or, speaking only for myself, I think I know—what § 1103(a)(1)'s proviso is *not*:  It is *not* the one thing it has been (vaguely) suggested to be.  But what is it, then?  Again, I think there are two ways that one might possibly understand the proviso—one more modest, the other much more robust.  The proviso either means—and    means    only—that    the    Attorney    General's

---

[1] To be sure, in *Negusie v. Holder*, the Court said (in what has become an oft-quoted dictum) that "[j]udicial deference in the immigration context is of special importance, for executive officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" 555 U.S. at 517. Even there, though, the Court applied only ordinary *Chevron* deference. *See id*. at 516–17. We have followed suit, quoting *Negusie*'s dictum while applying plain-old *Chevron* principles. *See, e.g.*, *Edwards v. U.S. Att'y Gen.*, 56 F.4th 951, 962 (11th Cir. 2022).

"determination[s]" regarding "questions of law" are "controlling" as against the other Executive Branch officials mentioned in § 1103(a)(1), or it means that the Attorney General's legal determinations are "controlling" more broadly, including on reviewing courts.

The former, I submit, is the far better reading—more faithful to § 1103(a)(1)'s text, context, and history. The latter is both less defensible on its own terms and quite likely unconstitutional. I'll consider each possibility in turn.

## A

Section 1103(a)(1)'s proviso is best understood, I submit, to empower the Attorney General to make legal determinations that are "controlling" vis-à-vis other Executive-Branch actors—but not vis-à-vis the courts. I say so for at least three reasons.

First, and most importantly, that's the best understanding of § 1103(a)(1) on its own terms. The provision opens by "charg[ing]" the Secretary of Homeland Security with the duty to "administ[er] and enforce[]" the Immigration and Nationality Act and all other immigration- and naturalization-related laws, "except insofar as [they] relate to the powers, functions, and duties" of other designated Executive-Branch officers—the President, Secretary of State, diplomatic and consular officials, etc. The statute thus carves out of the Secretary of Homeland Security's general purview prerogatives that are reserved to other executive officials. All of these intra-branch allocations, though, are subject to the subsection's concluding proviso: "*Provided, however*, [t]hat determination and ruling by

the Attorney General with respect to all questions of law shall be controlling." The upshot seems clear: As against the various Executive Branch officers who might play a role in the administration of the country's immigration laws, the Attorney General may make "determination[s]" regarding "questions of law" that are "controlling"—*i.e.*, binding on those officers.

Second, the context in which § 1103(a)(1) is situated confirms that plain-meaning interpretation. Nearly every subsection that follows § 1103(a)(1) explains the circumstances in which the Secretary of Homeland Security may delegate his powers to, or otherwise arrange duties among, officials within the Executive Branch. *See, e.g.*, 8 U.S.C. § 1103(a)(4) (giving the Secretary the ability to "require or authorize any employee of the [Immigration] Service or the Department of Justice" to perform any of the Secretary's duties); *id.* § 1103(a)(6) (authorizing similar delegation to "any employee of the United States, with the consent of the head of the Department"); *id.* § 1103(a)(7)–(9) (empowering the Secretary to "establish offices" for immigration enforcement in foreign countries "with the concurrence of the Secretary of State," station foreign countries' officers in the United States to enforce their immigration laws, and make reciprocal agreements with foreign countries to these effects); *cf. also, e.g.*, *id.* § 1103(a)(10) (authorizing the Attorney General to delegate his powers to "any State or local law enforcement officer," with the "consent" of his or her supervising entity, to address "an actual or imminent mass influx of aliens arriving" at the border). Put simply, § 1103(a)(1)'s statutory neighbors seem to underscore that the entire section's thrust is allocating

22-10445          Newsom, J., Concurring          7

functions within the Executive Branch and among its various offices and officers.

Finally, § 1103(a)(1)'s unique history suggests the very same thing. Congress amended § 1103 in 2003, just a year after creating the Department of Homeland Security. *See* Homeland Security Act Amendments of 2003, Pub. L. No. 108–7, § 1102(2), 117 Stat. 526, 531 (West); *History*, Dep't of Homeland Security, https://www.dhs.gov/history (2022). It made two notable alterations. Section 1103(a)(1) was kept exactly as-was, save for one change: To reflect that the head of the newly created Department would assume principal responsibility for administering the country's immigration laws, Congress replaced the words (and office) "Attorney General" with the words (and office) "Secretary of Homeland Security" in both the title and the prefatory clause:

> **(a)** ~~**Attorney General**~~ **Secretary of Homeland Security**
>
> > The ~~Attorney General~~ Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

*Id. See* 8 U.S.C. § 1103(a)(1).

In conjunction with its establishment of the Department of Homeland Security and its revision of § 1103(a)(1), Congress also enacted a new subsection, § 1103(g), which remains in the statute today:

> (g) Attorney General
>
> (1) In general
>
>> The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

*Id.* § 1103(g)(1). *See* Homeland Security Act of 2002, Pub. L. 107-296, § 1102, 116 Stat. 2135, 2274.

So, when Congress created DHS, amended § 1103(a)(1) to specify the respective roles of (among others) the Secretary of Homeland Security and the Attorney General, and added § 1103(g), it specified that the Attorney General's "authorities and functions"—presumably including his authority to issue "controlling" legal determinations—extended only as far as the Executive Office for Immigration Review's authority had previously reached. Before 2002, as today, the EOIR included the Immigration Judges and

22-10445                Newsom, J., Concurring                    9

the Board of Immigration Appeals. *See About the Office*, U.S. D.O.J., https://www.justice.gov/eoir/about-office (2022). The BIA's legal determinations did not then and do not now "control[]"judicial interpretations; rather, as today's majority opinion explains, the courts review the IJs' and BIA's legal decisions, as appropriate, under the various deference regimes. *See* Maj. Op. at 11–14. So, if the Attorney General has "such authorities and functions" as the EOIR, which includes the IJs and the BIA, and those administrative entities don't "[]"control court dispositions, then neither does the Attorney General. Reading § 1103(a)(1) to vest the Attorney General's legal determinations with "controlling" force vis-à-vis the courts would flatly contravene § 1103(g).

In sum, § 1103(a)(1)'s plain text, the statutory context in which it's situated, and its unique history all counsel the same conclusion: The statute empowers the Attorney General to render "determination[s]" on "questions of law" that are "controlling" as against other Executive Branch officials. But it says nothing about—and has nothing to do with—the weight that the Attorney General's legal determinations are due in court.


**B**

On a contrary reading, § 1103(a)(1)'s proviso purports to make the Attorney General's legal determinations "controlling" as a general matter—including on reviewing courts. That far more sweeping construction, while linguistically plausible—and

perhaps (?) even suggested in Supreme Court dicta[2]—suffers from two significant problems. Initially, as a matter of pure statutory interpretation, it wrenches the proviso out of context and thereby elevates literalism over proper textualism. *See, e.g.*, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1825 (2020) (Kavanaugh, J., dissenting) ("As Justice Scalia explained, 'the good textualist is not a literalist.'" (quoting Antonin Scalia, A Matter of Interpretation 24 (1997))). Moreover, so reading § 1103(a)(1) would almost certainly render it unconstitutional. I say that for several related reasons.

First, and most obviously, for more than 200 years now, it has been "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). No need to gild that lily: A reading of § 1103(a)(1) that would make the Attorney General's legal determinations "controlling" on reviewing courts would impermissibly divest the judiciary of its authority to "say what the law is"—and, in the doing, lodge that power in the executive. And it should go without saying that Congress can't mend that separation-of-powers breach simply by waving a wand and purporting to vest binding interpretive authority in the Executive Branch. In fact, to do so would be to commit the sin of *Hayburn's Case*, only in reverse. There, the Court held that Congress couldn't imbue judicial officers with executive authority because "neither the legislative nor the executive branches, can constitutionally assign to the judicial any duties, but such as are properly judicial, and to be performed

---

[2] *See, e.g.*, *Negusie*, 555 U.S. at 516–17; *see also supra* note 1.

in a judicial manner." 2 U.S. (2 Dall.) 408, 410 (1792). In so holding, the Court explained that "the legislative, executive and judicial departments are each formed in a separate and independent manner . . . ." *Id.* Infusing the Executive Branch with judicial authority—as § 1103(a)(1) would if it made the Attorney General's legal determinations of law binding on courts—would be no less unconstitutional.

Second, giving the Attorney General's legal determinations "controlling" force vis-à-vis reviewing courts would transgress the limits that Article III places on the activities of so-called non-Article-III tribunals. In *Stern v. Marshall*, for instance, the Supreme Court emphasized that "Article III could neither serve its purpose . . . nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." 564 U.S. 462, 484 (2011); *see also id.* at 483 ("[T]here is no liberty if the power of judging be not separated from the legislative and executive powers.") (quoting The Federalist No. 78, at 466 (Alexander Hamilton) (Clinton Rossiter, ed. 1961)). Indeed, in *Stern*, the Court invalidated a bankruptcy court's exercise of jurisdiction even though its decision was subject to "ordinary appellate review" by Article III courts. *Id.* at 494 (quoting *Thomas v. Carbide*, 473 U.S. 568, 584 (1985)). Needless to say, an interpretation of § 1103(a)(1) that accorded the Attorney General's legal determinations "controlling"

12                    Newsom, J., Concurring                    22-10445

weight in court wouldn't allow for anything approaching—indeed, would positively thwart—"ordinary appellate review."[3]

Finally, reading § 1103(a)(1) to give the Attorney General's determinations of law "controlling" force vis-à-vis courts would exacerbate already-existing concerns about unlawful delegations of judicial power. As matters stand, even ordinary *Chevron* deference is on thin non-delegation ice. *See Gundy v. United States*, 139 S. Ct. 2116, 2131–48 (Gorsuch, J., dissenting). If Executive Branch actors were freed from the obligation to provide even a "reasonable" interpretation to get their way, that ice would surely break.

★   ★   ★

Section 1103(a)(1) is something of a mystery to me. The Supreme Court has invoked it as a warrant for applying *Chevron*-deference principles in immigration-related cases—but for reasons I've explained, I don't think that's a particularly good fit. Read (hyper)literally, § 1103(a)(1)'s proviso might seem to make the Attorney General's determinations of law "controlling" in some sort of general, absolute sense—but as I've said, I don't think that can possibly be right. By far the best understanding of § 1103(a)(1), it

---

[3] This lack of Article III supervision would be particularly pronounced—and problematic—in cases involving questions about citizenship. Section 1103(a)(1) applies to Chapter 12 of Title 8, which contains subchapters concerning nationality and naturalization. *E.g.*, 8 U.S.C. § 1422 ("Eligibility for naturalization"); *id.* § 1435 ("Former citizens regaining citizenship"). The Supreme Court has held that citizenship claims are constitutional questions that *must* be adjudicated by Article III courts, not agencies. *See Ng Fung Ho v. White*, 259 U.S. 276, 284–85 (1922).

22-10445                Newsom, J., Concurring                13

seems to me, is that it really has *nothing* to do with the weight or deference that reviewing courts should give to the Attorney General's legal determinations.  Instead, it simply divides immigration-related labor among various Executive Branch officials and, as between them—and them only—authorizes the Attorney General to make binding legal determinations.  That's all.

The real problem is that no one really knows *what* § 1103(a)(1) means—or, to be more precise, the Supreme Court (even while invoking it) has never really told us what it means.  I, for one, would welcome the explanation.